PEOPLE *v.* HARPER.

• 1. CRIMINAL LAW—TRIAL—ORDER OF PROOF.

Where, on a trial for murder in which the contest is over the identity of the murderer, the court refuses to require the prosecuting attorney to call the only person claiming to be an eyewitness to the tragedy, it is error to require the production of such witness and take her testimony after both parties have rested and after defendant, by producing evidence tending to show her complicity in the crime, has furnished an incentive to her to color her testimony.

2. WITNESSES—IMPEACHMENT—BIAS—REWARD.

On a trial for murder it is error to refuse to permit a witness for the prosecution to be asked if he expects to share in the reward offered for the conviction of the murderer.

3. SAME—FOUNDATION FOR IMPEACHMENT.

Where a question to a witness of respondent concerning a statement made by a witness for the prosecution is overruled because the proper foundation has not been laid, it is reversible error to subsequently refuse to allow the foundation question to be put to the prosecution's witness on the ground that the whole matter has been previously covered.

Error to recorder's court of Detroit; Phelan, J.   Submitted June 14, 1906.   (Docket No. 99.)   Decided July 23, 1906.

Floyd S. Harper was convicted of murder in the first degree, and sentenced to imprisonment for life in the State prison at Jackson.   Reversed.

*Fred H. Aldrich* (*Louis H. Wolfe*, of counsel), for appellant.

*Ormond F. Hunt*, Prosecuting Attorney, and *Frank F. Bumps*, Assistant Prosecuting Attorney, for the people.

MONTGOMERY, J.   The respondent was convicted of
the crime of murder.   The crime imputed to him was the
murder of Patrolman John F. Daly on the 17th day of
November, 1904.   That a crime was committed by some
person is not disputed.   The question of fact about which
the controversy centered was the identity of the murderer.
In this cause Floyd S. Harper, together with his brother,
William Zach Harper, is charged in the same informa-
tion with the murder of John F. Daly, a police officer of
the city of Detroit, on the evening of November 17, 1904.
On that night at about 11 o'clock Patrolman John F.
Daly, while on duty, and as he was about to enter a
vacant lot in the rear of the buildings numbered 77 and
79 on Michigan avenue, occupied, respectively, as a
jewelry and a paper store, received a bullet wound from
which he died almost immediately afterwards.   Two shots
were heard immediately before the officer fell with the
wound from which he died.   Two men were observed
running from the scene of the tragedy immediately after
the shooting.   But one person claimed to have been an
eyewitness of the tragedy.   A woman known as Queenie
Herndon claimed that she was talking with the officer for
a number of minutes on the opposite side of the street
from the opening in the fence through which he entered
the vacant lot, and that she spoke to him just before he
entered this lot, and received an answer from him; that
immediately after the officer answered her she heard the
shots fired, and saw him fall.   This woman also claimed
that one of the men who ran from the scene of the tragedy
ran against her and spoke to her.   After leaving the place
where the officer was shot, one of the men started in an
easterly direction through the alley back of the vacant lot;
the other crossed Wayne street to an alley running
parallel with Lafayette avenue, and, just as he entered
this alley, was joined by the other man.

It is the theory of the prosecution that the man who ran
east after shooting, along the alleys, as above mentioned,
went around a flatiron block, and returned through the

continuance of the said alley running parallel with Lafayette avenue, joining the other party who ran directly across Wayne street, as above mentioned. One of the men entering the said alley running parallel with Lafayette avenue ran across a vacant lot between said alley and Lafayette avenue, going out on Lafayette avenue; the other continued through this alley for about two blocks, then turned toward Michigan avenue one block, and continued in a westerly direction along the alley between Howard and Abbott streets, until he was within about 15 feet of Third street, when he turned and shot one Herbert H. Pickell, who was pursuing him, inflicting upon him a serious wound. As the party who ran through these several alleys was passing through the alley between Wayne and Cass streets, he passed one Phelps, who was standing in this alley talking with a girl by the name of Ethel Davis. He shot twice at the man Phelps and passed on. As he was crossing Cass street one Herbert H. Pickell, a special officer for the Michigan Central Railroad Company, saw him running and pursued him until he was shot in the manner above mentioned. He was also seen while crossing Cass street by one Michael Goodwin, who was in company with Pickell, and as he emerged from the alley between Wayne and Cass streets passed within a few feet of one Joseph P. Gaffney, and shot at him as he was passing. As he was emerging from the alley between Cass and First streets he passed within a very few feet of one William Collett. One Ella Fox saw the two men as they were entering the alley between Wayne and Cass streets, but got an indistinct view of them. A witness, Mary Carney, saw the two men as they ran from the vacant lot where the officer was shot.

Immediately after the shooting the officers interviewed various persons who claimed to have seen the men running from the scene of the tragedy, and the whole police department of the city were alarmed, and were ordered to look for suspicious characters in the city, who might be the murderers of Officer Daly. A description was given

of said parties, made up of descriptions received by the officers immediately after the shooting from parties claiming to have seen the men running from the scene of the tragedy. These descriptions were of a tall man and a short one. The tall man was supposed to be a colored man, and the short man was supposed to be a white man. By instructions of Lieutenant Walpole the police arrested several colored men on suspicion the same night of the shooting. Upon examination of the premises, it was found that a window in the back part of the paper store had been raised a few inches, evidently by a sharp instrument like a chisel, and a carpenter's chisel was found on the ground near said window which was put in evidence in the cause. About a week prior to this tragedy a carpenter shop owned by one Marentette, at No. 123 Larned Street West, in the city of Detroit, was entered by burglars and a chisel stolen therefrom, which was identified by Alfred Robarge, an employé of the said Marentette, as his property. No attempt was made on the part of the people in the trial of this cause to explain to the jury where the chisel above mentioned was procured, or to explain anything of the burglary by which the same was secured from the said carpenter's shop, all of the facts in relation thereto being brought out by the defense. Back of the said jewelry store is a narrow room, connected with the said paper store. On the evening of the said tragedy at about a quarter to 6 o'clock a large colored man was seen by William C. Ross, who had charge of the said paper store, looking into the windows of the said paper store in such a manner as to attract his attention. Said Ross went from the back part toward the front of his said store, when the said colored man entered the store and purchased some cheap paper and assumed a position in the store where he could command a full view of the said narrow room back of the said jewelry store.

Immediately after the night of the tragedy the said Queenie Herndon was taken by the officers and detained at police headquarters as a witness for the people, until

after the examination of the respondents upon the charge
of the said murder of the said Officer Daly.  At said ex-
amination she claimed that the man who ran against her
wore a moustache, and refused to identify Floyd S. Har-
per as such person.  Very soon thereafter she was dis-
charged from the police headquarters, her name was not
put upon the information as a witness, and the prosecut-
ing attorney refused to call her as a witness in said
cause.  The attorneys for the respondent objected to the
prosecuting attorney proceeding with other branches of
the cause before he had proven the corpus delicti therein,
stating among other grounds of such objection that the
said Queenie Herndon had not been sworn, which objec-
tion was overruled, and exception taken.

At the close of the people's testimony counsel for the
defendant moved that the respondent be discharged by
reason of the fact that the woman Queenie Herndon, an
eyewitness, as she claimed, of the tragedy, had not been
called.  Testimony had theretofore been introduced which
showed that she had made such claim.  The testimony of
the defendant had a tendency to show, and it was the
theory of the defendant, that this Queenie Herndon, who
was shown to be a disreputable character, was connected
with the murder of the said Officer Daly; that she had
been watching in the neighborhood of the scene of the
tragedy for a considerable time theretofore; that one
known as Walter Q. Christine, whom she claimed to be
her husband, appeared in the neighborhood very soon
after the shooting, and met her in that vicinity.  After
the defense had rested and the people had introduced their
testimony in rebuttal and rested, the court ordered said
Queenie Herndon to be produced in court and sworn in
said cause, and she was produced and sworn against the
objection of the said respondent, to which action on the
part of the said court respondent excepted.

In most cases the order of proof is within the discretion
of the trial judge, but when it is manifest that prejudice
has resulted from a failure to observe the order which the

law points out, we should not permit a verdict to stand. If the reasons for declining to call Queenie Herndon in order were valid when the court ruled that the prosecution was justified in leaving her off the stand they were equally forceful after the respondent's defense had been developed, and there was the additional reason that the defense, by attacking this witness and by developing the theory that she was herself concerned in the crime, had furnished an incentive to her to color her testimony against the respondent. The case was one in which an observance of the proper order of proof was obviously of vital importance.

On the cross-examination of one Phelps, a witness for the people, he was asked in substance if he expected a portion of a $1,000 reward if the respondent was convicted. The question was excluded. This was error. It was competent to show the interest of the witness.

One Pickell was an important witness for the people, and identified the respondent as one of the men seen by the witness fleeing from the scene of the crime. One Frank Mahon, a reporter for the Evening News, was called and asked as to whether the witness Pickell had made statements relative to his ability to identify the respondent which were inconsistent with those made on the stand. Objection was made that the proper foundation had not been laid, and the objection was sustained. The court thereupon very properly stated:

" If counsel for defendant believe that they can impeach his testimony, inasmuch as he is one of the witnesses as to the identity of this defendant, I think that in fairness and in justice he should be permitted to go upon the witness stand. Better call him. You may step aside, Mr. Mahon, for the present."

Later Pickell was recalled, and the following occurred:

"*Q.* At an interview between yourself and Mr. Mahon, November 25, 1904, between the hours of 7 and 8 o'clock, in your room at Harper Hospital, did you state to Mr.

Mahon as follows: ‘I am positive Floyd Harper is the man who shot me, but I can't swear to it?’

"*Mr. Bumps:* Just a moment. If the court pleases, I object to this as having been all gone over, this same article, and these same questions asked this witness before.

"*Judge Aldrich:* I think I asked him the question before myself, but I didn't know Mr. Mahon was the man.

"*Mr. Bumps:* This identical question has been asked this witness, and all other questions concerned in this article, which my brother now has in his hand.

"*Judge Aldrich:* But I did not ask with reference to Mr. Mahon.

"*The Court:* Mr. Reporter, will you please look back to this question and answer that was asked this witness on cross-examination? ( Last question read by the stenographer).

"*Mr. Bumps:* That is objected to.

"*The Court:* I think I will sustain the objection.

"*Judge Aldrich:* I desire an exception."

It is clear that one or the other ruling was prejudicial error. It is manifest that the respondent's counsel was endeavoring to get the benefit of a qualifying statement of Mr. Pickell. When the witness Mahon was asked to give the conversation the objection was made that the proper foundation was not laid. When an attempt was made to comply with the court's suggestion that the foundation be laid the objection that the whole ground had been traversed prevailed. The other questions presented are not likely to arise on a new trial.

For the errors pointed out the conviction is set aside, and a new trial ordered.

BLAIR, OSTRANDER, and MOORE, JJ., concurred with MONTGOMERY, J.

GRANT, J. I concur on the last two points of the opinion.