PEOPLE *v* CUYLER

OPINION OF THE COURT

1. CRIMINAL LAW—WITNESSES—NONPRODUCTION—DUE DILIGENCE.

Defendant's objection on appeal to the use of testimony from a preliminary examination transcript was without merit where the record shows that the prosecution exercised due diligence in trying to obtain trial attendance of the missing witness, the witness was discovered on the evening of the trial, the prosecutor offered the defense the opportunity to cross-examine, and the defense declined.

DISSENT BY LEVIN, J.

2. CRIMINAL LAW—WITNESSES—NONPRODUCTION—DUE DILIGENCE.

*A prosecutor did not use due diligence to produce a witness for trial where a month before trial the police had learned the witness was in Indiana, four days before the trial the police learned from the Indiana police that the witness might be returning to his home in Michigan and learned from the witness's father that the father had seen the witness's wife around town within the past month, and nothing further was done to locate the witness, because the people should have followed through on the leads that the witness had returned to his home in Michigan.*

3. CRIMINAL LAW—WITNESSES—NONPRODUCTION—DUE DILIGENCE—REOPENING PROOFS.

*The trial judge's error in finding that the prosecutor had used due diligence in trying to locate an important prosecution witness was not cured by the prosecutor's offering to reopen proofs to allow defendant to cross-examine the witness, who*

REFERENCES FOR POINTS IN HEADNOTES

[1] 21 Am Jur 2d, Criminal Law § 343.
Federal constitutional right to confront witnesses, Supreme Court Cases. 23 L Ed 2d 853.
[2, 3] 58 Am Jur 2d, New Trial § 40.

*had since been found, because defendant would have had
to choose between waiving his right to be the last to produce
evidence heard by the jury before it began deliberation.*

Appeal from Calhoun, Creighton R. Coleman, J.
Submitted Division 3 November 2, 1971, at Grand
Rapids. (Docket No. 10685.) Decided February
23, 1972. Leave to appeal denied, 387 Mich 793.

Richard S. Cuyler was convicted of assault with
intent to rape. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A.
Derengoski,* Solicitor General, *John M. Jereck,* Act-
ing Prosecuting Attorney, and *Noel G. Petersen,*
Chief Prosecuting Attorney, for the people.

*Edward J. Hackett,* for defendant on appeal.

Before: R. B. BURNS, P. J., and LEVIN and T. M.
BURNS, JJ.

R. B. BURNS, P. J. The defendant was convicted
of the crime of assault with intent to rape. MCLA
750.85; MSA 28.280.
Defendant's objection to the use of testimony
from a preliminary examination transcript is with-
out merit. The record shows an exercise of due
diligence and a good faith effort by the prosecutorial
authorities to obtain trial attendance of the missing
witness. *Barber v Page,* 390 US 719; 88 S Ct 1318;
20 L Ed 2d 255 (1968); *People v Nieto,* 33 Mich App
535 (1971).
In fact, the missing witness was discovered the
evening of the trial. Although proofs had been
closed neither side had presented their final argu-
ments to the jury when the prosecutor informed de-

fense counsel that the missing witness was in the courtroom and offered the defense the opportunity to cross-examine the witness. The offer was denied.

Affirmed.

T. M. Burns, J., concurred.

Levin, J. (*dissenting*). The record does not support the majority's conclusion that the prosecutor exerted due diligence to secure the attendance at the trial of the missing witness, Edward Vinkle. It was, therefore, error to allow the people to read into evidence at the trial the transcript of Vinkle's preliminary examination testimony.

The scheduled trial date was August 18, 1970.[1] A month earlier, July 10, 1970, a police officer attempted to serve a subpoena on Vinkle in Battle Creek, the city in which he was living at the time the charged offense was committed. Vinkle's mother told the officer that her son had gone to Anderson, Indiana. Twelve days later, July 22, reciprocal subpoena papers were mailed to the police in that city.

No further action was taken until Friday, August 14, four days before the scheduled trial date. On the 14th, the Battle Creek police telephoned the Anderson, Indiana police and learned that Vinkle had last been seen in Indiana on August 8 and had mentioned to a cousin that he was contemplating either returning to Battle Creek or going to Wisconsin. Also on the 14th, the Battle Creek police communicated with Vinkle's father in Battle Creek, who told them that he did not know his son's whereabouts; at the trial the father said that he had seen his son's wife about a month earlier in Battle Creek. It appears that Vinkle and his father were not on speak-

---

[1] This was six months after the preliminary examination.

ing terms because of religious differences. No effort was exerted by the people to locate the missing witness in Battle Creek over the weekend.

On Monday, August 17, the day before the trial, a subpoena was served on the father to assure his presence to assist in explaining the people's failure to produce Vinkle, but nothing was done on Monday in an effort to locate Vinkle. On Tuesday, August 18, the trial commenced. The judge ruled that the people had made a diligent effort to locate Vinkle and that his testimony at the preliminary examination could be read to the jury.

If the prosecutor wished to use Vinkle's preliminary examination testimony, he was obliged to exert due diligence in an effort to locate him and, if he were located, due diligence to attempt to secure his attendance. *Barber* v *Page,* 390 US 719; 88 S Ct 1318; 20 L Ed 2d 255 (1968); *People* v *Tess,* 386 Mich 483 (1971); *People* v *Nieto,* 33 Mich App 535 (1971); *People* v *McIntosh,* 34 Mich App 578, 591 (1971) (LEVIN, P. J., *dissenting*), *leave granted* 386 Mich 762 (1971).

The police had a lead from the Indiana informant indicating that Vinkle may have returned to his home in Battle Creek. Vinkle's father had seen his son's wife within the past month in Battle Creek. It·cannot properly be said, in the face of the total failure to pursue the lead indicating that Vinkle may have returned to Battle Creek, that the people exerted due diligence in an effort to locate him.

Vinkle was, indeed, in Battle Creek, as developed late Tuesday after both the people and the defendant had rested.[2] On Wednesday morning, before the judge instructed the jury, he informed the de-

---

[2] Vinkle was located without difficulty by a police officer who went looking for him on Tuesday after listening to the proofs of the desultory efforts to produce Vinkle.

fendant's lawyer that Vinkle had been located, that Vinkle was in court and that the judge was prepared to reopen the case and allow the defendant's lawyer to cross-examine Vinkle if he wished to do so. The defendant's lawyer declined because he felt that this would do more harm than good.

At first blush it may not seem that it would be unfair to the defendant to hold that the judge's earlier error in finding that the people exerted due diligence was cured when the defendant was given and declined the opportunity to cross-examine Vinkle. On closer scrutiny, however, it is clear that when Vinkle was belatedly produced the defendant was in effect being asked to decide between two unattractive alternatives. He could either waive his right to cross-examine Vinkle or, if he exercised that right, give up the advantage of having his evidence be the last evidence heard by the jury before it deliberated.

In *People v Quick*, 58 Mich 321, 323 (1885), the people were permitted to call witnesses after the defendant had rested. The Michigan Supreme Court reversed saying that the witnesses were not truly rebuttal witnesses but "were called to prove what belonged to the people's case in chief". The Court continued:

"Cases may sometimes arise where testimony which could not be had in the opening may be let in upon *good cause shown thereafter*. But it is not proper to divide up the testimony on which the people propose to rest their case, and nothing which tends to prove the commission of the crime itself or its immediate surroundings can be classed as rebutting evidence under ordinary circumstances, if at all." (Emphasis supplied.)

Similarly, see *People v Harper*, 145 Mich 402, 406–407 (1906).

In *People* v *Carter,* 48 Cal 2d 737, 753; 312 P2d 665, 675 (1957), the Supreme Court of California reversed a conviction in a case where the people had been allowed to introduce, in rebuttal, evidence that should have been part of their case in chief. In so holding, that Court said that one of the reasons for requiring the people to present their case first is "to prevent a party from unduly magnifying certain evidence by dramatically introducing it late in the trial".

In this case, Vinkle had testified at the preliminary examination about some highly incriminating admissions allegedly made by the defendant on the night of the attempted rape. Had the defendant's lawyer availed himself of the belated opportunity to cross-examine Vinkle, he would necessarily have had to go into the details of the supposed conversation in his effort to disparage Vinkle's testimony. Availing himself of the right of cross-examination might well have served to emphasize Vinkle's testimony just as the case was about to be submitted to the jury. The attempt to cure one error by committing another, potentially as grievous as the first, is bound to be futile.

We employ essentially the same standard, namely, good cause, to determine (1) whether the people may use the preliminary examination testimony of a missing witness, and (2) whether they may offer a witness after their proofs are closed. In this case the people failed to establish good cause for their failure to produce Vinkle. Accordingly, the people should not have been allowed to read his preliminary examination testimony or to present him as a witness after the proofs were closed.

Fairness to the defendant requires that he be given a new trial in which he can both confront Vinkle,

who was one of the principal witnesses against him, and present his defense after the people have rested their case in chief.