[Crim. No. 5910. In Bank. June 21, 1957.]

THE PEOPLE, Respondent, v. THOMAS CARTER, Appellant.

Robert K. Stone, under appointment by the Supreme Court, Laughlin & McKalson and Robert E. Laughlin for Appellant.

Edmund G. Brown, Attorney General, Doris H. Maier and J. M. Sanderson, Deputy Attorneys General, and C. Keith Lyde, District Attorney (Butte) for Respondent.

TRAYNOR, J.—Defendant was convicted of murder in the first degree and the jury imposed the death penalty. A motion for a new trial was denied. This appeal is automatic. (Pen. Code, § 1239, subd. (b).)

On September 29, 1955, about 3:35 p. m., Frank Carey, owner of the Log Cabin Bar near Chico, was found uncon-

scious on the floor of the card room of his bar, his head bloody and bruised. He never regained consciousness and died several hours later as a result of his injuries.

Defendant was in the bar from the time Carey opened it about 12:30 p. m. until shortly after 3 p. m., drinking beer, playing the pinball machine, and talking with other customers. Witnesses testified that he was wearing khaki trousers, a dark jacket, and a cap with a pushed-up bill. His grey Dodge pickup truck was parked out in front. The last person to see him in the bar was a salesman who arrived about 3 p. m. and stayed about five minutes. He spoke briefly with Carey and defendant. Carey told him that business had been good that week and that he was holding a 20-dollar bet on the World Series. About 3:35 p. m., Carey's accountant entered the bar and found Carey unconscious. A no-sale sign was rung up on the cash register, and there was no currency in the drawer.

At about 3:25 p. m. a grey pickup similar to defendant's cut in front of a school bus on the highway near defendant's house, causing the bus driver to stop suddenly to avoid a collision. The pickup entered the driveway of defendant's house. At 4 p. m. defendant's landlord went to the house to collect the rent, which was a month and a half in arrears. Defendant appeared in dark, not khaki trousers. He promised to pay the rent soon.

Shortly after midnight, Deputy Sheriff Rushton confronted defendant and his wife in a cocktail lounge in Chico and informed defendant that the sheriff wanted to talk to him at the police station. Defendant asked if he could take his wife home first, and Rushton agreed. Defendant, his wife, and Rushton then drove to the Carter house in the pickup, while another officer followed in a patrol car. As they entered the house, defendant handed his wife a notebook, telling her to mail the letter therein. While Rushton waited in the living room, defendant looked in on his children in their beds. He then went into the bathroom and closed the door. Thereafter Rushton heard the latch click and called to defendant several times but got no response. When he heard something fall to the floor, he broke down the bathroom door. He found that defendant had slashed his arm with a razor and was lying on the floor with blood spurting from an artery. Despite defendant's resistance Rushton managed to check the flow of blood. He testified that defendant said to him after coming out of a state of shock, "You wouldn't tell me what you wanted me for, but I knew"; that Rushton asked, "What

did you think we wanted you for?'' and that defendant did not answer but ''just laid back and grinned.'' Other police officers arrived, an ambulance was summoned, and defendant was removed to a hospital.

Early in November 1955, Carey's wallet, a flexhandle wrench, and a red cap were found under a bridge at Edgar Slough, about two-tenths of a mile from defendant's house. There was no money in the wallet, although Carey was in the habit of carrying substantial sums. One of defendant's neighbors, E. E. Myers, testified that he had lent defendant a set of tools that included a wrench of the same make and size as the one found in Edgar Slough and that this wrench was not among the tools shown to him by the police as those removed from defendant's truck.

Dr. Paul Kirk, a witness for the prosecution, testified that he examined the card room of the Log Cabin shortly after the homicide, and found that the grease on the floor was identical with grease on the wrench discovered in Edgar Slough. He also testified that there was blood on defendant's shoes and the lower part of his khaki trousers, and that the blood was type B, Carey's type. He further testified that he found on the inside of the right rear pocket of the trousers another blood stain and two hairs that had a ''microscopic identity'' with hair taken from Carey's head. Finally, he testified that one of 11 hairs found in the cap from Edgar Slough was ''morphologically indistinguishable'' from one-fifth of a sample of defendant's hair.

Defendant took the stand in his own behalf and denied that he had either robbed or beaten Carey. His own account of what he did on September 29th was substantially as follows: He left the Log Cabin shortly after 3 p. m. intending to go home, but after driving a short distance decided to return and try his luck again at the pinball machine. When he entered the bar and did not see Carey, he called several times. Receiving no answer, he looked into the card room. There he saw Carey lying on the floor with his face to the wall, bleeding and breathing hard. He bent over the body and rolled it towards him, and blood spattered on his trousers, shoes, and hands. He reached for a handkerchief in his rear pocket and must have stained it with blood.

Defendant testified that he was terrified by these events and by the realization that many persons had seen him in the bar and if police questioned him they would find out that he had violated his parole from the Washington State Peni-

tentiary to which he had been sentenced for burglary. He therefore did not report his discovery to any one but drove straight home and later changed his trousers. In a statement to the police on September 30th, however, he had denied any knowledge that Carey had been beaten and stated that the blood on his trousers must have been his own.

Defendant explained his attempted suicide by testifying that he was short of money and owed a number of bills, that he had passed several bad checks, and that he was afraid he would be sent back to prison as a parole violator. Moreover, he was generally despondent and had intended for some time to kill himself. The notebook that defendant handed to his wife before his attempted suicide contained a letter to his uncle, written before the attack on Carey, declaring defendant's intention to kill himself.

Before trial defendant moved to suppress evidence allegedly acquired by a search and seizure in violation of defendant's constitutional rights. The motion was denied. During the trial defendant unsuccessfully renewed his objection to the use of some of this evidence. His objection compels examination of the circumstances under which the challenged evidence was obtained.

After defendant attempted to kill himself and Deputy Rushton broke into the bathroom, about half an hour elapsed before defendant was removed in an ambulance. Mrs. Carter testified that during that time she was confused by the numerous police coming in and out of the house and that her five children were upset and crying over the commotion and the sight of their father being carried out on a stretcher.

About 1:15 a. m., some 15 minutes after defendant had been carried out and all the police had left, Deputy Arbuckle returned to the house. He testified that "The sheriff told me to go back and get the letter Mr. Carter mentioned." When Mrs. Carter answered the door, he told her that "the sheriff wanted me to come back and get the letter," or, according to Mrs. Carter, "he had to see the letter." She handed over the notebook containing the letter, and although she asked if she could keep the notebook itself, Arbuckle stated that it would be better if he took the letter and the whole notebook.

While Deputy Arbuckle was still in the house, two more officers appeared and questioned Mrs. Carter about the clothes defendant had been wearing during the day. They testified that they asked Mrs. Carter if they could see defendant's trousers, and that she got them from another room. Mrs.

Carter testified that it was the officers themselves who got the trousers. After examining the trousers, the officers left them on the ironing board and departed.

Around 2:15 a. m. Deputy Arbuckle returned to the house again and told Mrs. Carter, "the Sheriff wanted me to bring those trousers up," or, according to Mrs. Carter, "that they would have to have the trousers." Mrs. Carter said nothing and stepped aside; Arbuckle went in, took the trousers from the ironing board, and departed. Arbuckle did not inform Mrs. Carter that she could refuse to turn the trousers over to him, and she testified that she did not know she could refuse. She also testified that the police would not tell her why they were investigating her husband.

Still later, Arbuckle and Rushton returned once again, and, according to their testimony, asked Mrs. Carter if they could have the shirt, or "informed [Mrs. Carter that they] . . . came after the shirt. . . ." They testified that this time they told her she could refuse. She said that the children were upset and she would prefer not to be disturbed again until morning, but the officers said that if they could have the shirt they would not bother her again. Mrs. Carter said all right, if this would be the last time, and Rushton went in and took the shirt from the bathroom.

About 8 a. m. more officers appeared at the house, examined defendant's pickup truck, which was parked either in the driveway or in front of the house, and made a list of the tools in it. They either told Mrs. Carter they were taking the truck away or asked and received her permission to take it away. It is admitted that at no time during these visits to defendant's house did the police have a warrant or was defendant under arrest.

The prosecution contends that the consent of defendant's wife justified the seizure of his property. The effect of a wife's consent to the search or seizure of her husband's property is the subject of sharp disagreement in other jurisdictions. (See e.g., *United States* v. *Heine* (2d Cir.), 149 F.2d 485, 488, cert. denied, 325 U.S. 885 [65 S.Ct. 1578, 89 L.Ed. 2000]; *United States* v. *Sergio* (E.D.N.Y.), 21 F. Supp. 553, 554; *Ellis* v. *State,* 130 Tex.Crim. 220 [93 S.W.2d 438, 439-440]; *Cass* v. *State,* 124 Tex.Crim. 208 [61 S.W.2d 500, 501-503]; but see e.g., *Cofer* v. *United States* (5th Cir.), 37 F.2d 677, 679; *Dalton* v. *State,* 230 Ind. 626 [105 N.E.2d 509, 511-512, 31 A.L.R.2d 1071]; *Simmons* v. *State,* 94 Okla.Crim. 18 [229 P.2d 615, 618]; Annot., 31 A.L.R.2d 1078, 1080-1081,

1091.) The problem calls for a determination of whether the wife's relation to her husband and his property is such that there is no invasion of his privacy if she consents.

When the husband is absent from the home, it is the wife who controls the premises, the ordinary household property, the family automobile, and with her husband's tacit consent determines who shall and who shall not enter the house on business or pleasure and what property they may take away with them. (*Cf. People* v. *Dominguez,* 144 Cal. App.2d 63, 65 [300 P.2d 194].) When the usual amicable relations exist between husband and wife (*cf. Kelley* v. *State,* 184 Tenn. 143 [197 S.W.2d 545, 546]), and the property seized is of a kind over which the wife normally exercises as much control as the husband, it is reasonable to conclude that she is in a position to consent to a search and seizure of property in their home. If Mrs. Carter freely consented to the removal of defendant's property, there was no unreasonable search or seizure. (*People* v. *Burke,* 47 Cal.2d 45, 49 [301 P.2d 241]; *People* v. *Gorg,* 45 Cal.2d 776, 782-783 [291 P.2d 469]; *People* v. *Martin,* 45 Cal.2d 755, 761 [290 P.2d 855]; *People* v. *Michael,* 45 Cal.2d 751, 753-754 [290 P.2d 852]; *People* v. *Wilson,* 145 Cal.App.2d 1, 7 [301 P.2d 974]; see *Amos* v. *United States,* 255 U.S. 313 [41 S.Ct. 266, 65 L.Ed. 654].) The burden of proving such consent was on the prosecution. (*Badillo* v. *Superior Court,* 46 Cal.2d 269, 272 [294 P.2d 23].)

No question arises as to the seizure of the notebook and letter by Deputy Arbuckle on his 1:15 a. m. visit. The evidence in the letter was favorable to defendant, and by introducing it at the trial himself, he has waived whatever objections he may have had. As to the second visit by Officers Parker and Evans, the evidence supports the conclusion that Mrs. Carter freely consented to their entering the living room to question her about defendant's activities. (See *People* v. *Michael,* 45 Cal.2d 751, 754 [290 P.2d 852].) What evidence they gained from their conversation and observation was therefore admissible. Moreover, the evidence that Mrs. Carter freely cooperated with the officers on this visit, produced the trousers when she was requested to do so, and consented to the subsequent taking of the shirt, supports the trial court's conclusion that she also consented to Deputy Arbuckle's taking the trousers when he returned for them.

The state of the record makes it impossible for us to determine whether the evidence gained from the search of

defendant's truck was properly admitted. At the hearing before trial on the motion to suppress, the only evidence introduced on this question was Mrs. Carter's testimony that an officer had come to the door and told her that they were taking the truck away, and that she had not said that it would be all right. If her testimony was true, there was no consent. At the trial, before another judge than the one who had ruled on the motion to suppress, the sheriff testified that he had asked for and received permission from Mrs. Carter to remove the truck. If his testimony was true, there was enough evidence to support a finding of consent. The record indicates, however, that in overruling defendant's motion to exclude the evidence, the trial court did not consider Mrs. Carter's testimony in support of the earlier motion, which flatly contradicted the sheriff's testimony. It failed to do so apparently on the ground that it was unnecessary to reconsider a matter already considered by another judge. It indicated that defendant would not be permitted to introduce evidence considered on the earlier motion. On retrial it will be possible for the court, if evidence obtained from the truck is introduced again, to consider all the evidence bearing on the question of Mrs. Carter's consent to the search of the truck and determine whether she or the sheriff is to be believed.

Defendant next contends that the prosecution deliberately destroyed material physical evidence, implying that as a consequence defendant cannot ever be given a fair trial. In his affidavit defense counsel alleges that he requested the district attorney to allow defendant's criminologist to inspect the Log Cabin; that the district attorney informed counsel that the keys to the premises had been returned to the attorney for Carey's executrix; that counsel discovered that the keys had not in fact been returned to the attorney but must have still been in the possession of the prosecution. On January 6th, defense counsel again asked the district attorney to permit defendant's criminologist to inspect the premises. The district attorney replied that an inspection would be permitted on January 14th, but on January 13th he informed defense counsel that the premises had been cleaned up and returned to the Carey family.

If these allegations be true, the State may have disabled itself from ever giving defendant a fair trial. Following the incidents in January, however, defendant did not make any such sweeping claim of prejudice. ■ Instead, he moved the court to compel the district attorney to turn over to defend-

ant's criminologist all physical evidence taken from the Log Cabin, all photographs made there, and the findings of the prosecution's criminologist based on his examination of the premises. Defendant stated that unless his motion were granted there could not be a fair trial. In fact no order of court was necessary, for the district attorney voluntarily produced all that defendant requested. Defendant's apparent satisfaction was a concession that access to all that the prosecution had discovered was an adequate substitute for inspection of the premises by his own criminologist. Moreover, defendant does not contend that specific evidence was suppressed, or that there is any likelihood that his criminologist would have found evidence not unearthed by the prosecution's expert.

Defendant next cites as error the exclusion of certain evidence. The prosecution relied on defendant's attempted suicide as evidence of a guilty mind, and thus as indirect evidence that defendant had administered the beating to Carey. To rebut this inference defendant sought to introduce testimony by Dr. Locarnini that immediately after defendant attempted suicide he was rushed to the hospital in a critical condition; that the doctor thought he would die; that when asked if he thought he would die defendant answered yes; that he answered yes when asked if he wanted to clear his conscience and then stated that he had passed some bad checks but made no mention of the Log Cabin or Carey.

It was error to exclude this testimony, for it provided an explanation for defendant's attempted suicide other than that offered by the prosecution. (See *People* v. *Goodwin,* 202 Cal. 527, 540-541 [261 P. 1009]; *People* v. *Sainz,* 162 Cal. 242, 246 [121 P. 922]; *People* v. *Anderson,* 57 Cal.App. 721, 727 [208 P. 204]; 22 C.J.S. 965.) The testimony would not be merely cumulative. True, defendant's testimony on the stand and his statement to the district attorney, recorded and played in court, apprised the jury of the reasons defendant gave for his attempted suicide, and these were the same as he gave when he was at the point of death. It does not follow, however, that Dr. Locarnini's testimony would be merely cumulative. Although cumulative in the sense that it was identical in subject matter with this other evidence, the testimony was not cumulative in respect to its evidentiary weight. The jury would be more inclined to believe an explanation given immediately after the attempted suicide, when defendant thought he was going to die, than the same explanation given at a time when hope of life had returned and the opportunity

for fabrication intervened. Defendant's suicide note to his uncle before the attack on Carey was some evidence of motivation for his attempted suicide other than guilty knowledge of the attack. Since the note was written before the attack, however, it could not be so persuasive evidence as the statement to Dr. Locarnini. The note made no mention of the bad checks or any other particular reason for suicide. The reason for the exclusion of merely cumulative evidence, that its slight probative value is outweighed by the disadvantage of confusing the jury and obscuring the fundamental issues (see 6 Wigmore, Evidence 576-578, 581-586 (3d ed. 1940)), fails in the present case because the probative value of the excluded testimony was greater than that of the other evidence introduced on the same issue.

The court also erred in excluding the testimony of defendant's minister. Defendant offered the testimony of Reverend Crouch that on October 4th defendant told him the same story as he told on the stand: that he had left the Log Cabin, and then returned and found Carey lying on the floor of the card room, and in turning him over got blood on his clothes. At the time he told this story to Reverend Crouch, defendant did not know that the blood on his clothes had been analyzed as Carey's type or that hairs similar to Carey's had been found on his trousers. Defendant had a right to introduce this testimony to rebut the prosecution's charge that his story was a recent fabrication. (See *People* v. *Hardenbrook, ante,* pp. 345, 351-352 [309 P.2d 424]; *People* v. *Walsh,* 47 Cal.2d 36, 48 [301 P.2d 247]; *People* v. *Kynette,* 15 Cal.2d 731, 753-754 [104 P.2d 794], cert. denied, 312 U.S. 703 [61 S.Ct. 806, 85 L.Ed. 1136].) Again, this evidence would not be merely cumulative. In the tape-recorded interview between defendant and the district attorney, introduced in evidence, defendant did not give the explanation he gave on the stand, but on the contrary disclaimed any knowledge of the attack on Carey. This statement did not, therefore, rebut the charge of recent fabrication but gave it additional support. The statement to Reverend Crouch was the only declaration by defendant that tended to rebut that charge and should have been admitted.

Defendant next cites as error the admission of certain evidence. Dr. Kirk was permitted to testify that he had made certain experiments in blood dynamics: that he had beaten various bloody objects with instruments of different shapes in order to grasp the relationship between blood spots and their

causes. Defendant contends that it was error to admit this evidence because the experiments were not conducted under circumstances substantially similar to those in the card room of the Log Cabin when Carey was beaten. It is true that the conditions were not substantially similar, but generally this requirement is imposed only when it is claimed that the results of an experiment are directly relevant to some issue in the case. (*People* v. *Wagner,* 29 Cal.App. 363, 367-370 [155 P. 649].) The prosecution made no attempt to show that because certain spots were produced by a certain cause in the experiments, similar spots on defendant's clothes or the floor of the card room must have been produced by a similar cause. In fact, there was no evidence of the results of the experiments; Dr. Kirk testified only that he had made them.

 Evidence that he had made the experiments was introduced to qualify him as an expert in blood dynamics, to show that by training and experience he was able from an analysis of the size and shape of blood spots to determine their source with some degree of accuracy, and to enable the jury to test the reliability of his opinions by revealing their foundation. For these purposes the evidence was properly admitted. (*People* v. *Crooms,* 66 Cal.App.2d 491, 496 [152 P.2d 533]; *Hastings* v. *Serleto,* 61 Cal.App.2d 672, 688-689 [143 P.2d 956].) It may be that when a specific experiment is the sole basis for an expert opinion, it would be essential to an adequate foundation that the experiment be made under conditions substantially similar to those that existed under the facts of the case, as it is essential to relevancy when the results of an experiment are introduced as direct evidence on an issue. The experiments in the present case, however, were by no means the sole basis for Dr. Kirk's opinion. He testified to general experience and knowledge of chemistry and physics, and of blood dynamics in particular. The experiments themselves were the last phase of work extending over a number of years, and Dr. Kirk stated that his opinions did not rest solely on their results.

From an analysis of the size and shape of blood spots in the card room, Dr. Kirk gave his opinion as to what their point of origin must have been. Then, from an analysis of the blood spots on defendant's clothes, he stated that if the blood was spattered on the clothes at the time Carey was beaten, the person wearing them must have been not more than two and one-half feet from the source of the blood. These inferences required knowledge and experience beyond those

of ordinary jurors and could assist them to weigh the evidence more perceptively than they could unaided. (*People* v. *Crooms*, 66 Cal.App.2d 491, 494-496 [152 P.2d 533]; see *People* v. *Cole*, 47 Cal.2d 99, 103-106 [301 P.2d 854]; *George* v. *Bekins Van & Storage Co.*, 33 Cal.2d 834, 843-844 [205 P.2d 1037].)

Defendant contends that the court abused its discretion in admitting into evidence certain colored slides of Carey taken at the time of the autopsy. The slides showed the deceased's head, face, and neck, and the wounds that had caused his death, and were used by the autopsy surgeon as the basis for his testimony. If the principal effect of demonstrative evidence such as photographs is to arouse the passions of the jury and inflame them against the defendant because of the horror of the crime, the evidence must of course be excluded. (*People* v. *Cheary*, *ante*, pp. 301, 311-312 [309 P.2d 431]; *People* v. *Cavanaugh*, 44 Cal.2d 252, 266-268 [282 P.2d 53], cert. denied, 350 U.S. 950 [76 S.Ct. 325, 100 L.Ed. 828].) On the other hand, if the evidence has probative value with respect to a fact in issue that outweighs the danger of prejudice to the defendant, the evidence is admissible even if it is gruesome and may incidentally arouse the passions of the jury. (*People* v. *Cheary*, *ante*, pp. 301, 312 [309 P.2d 431].) It is primarily for the trial court in the exercise of its discretion to weigh the importance of putting before the jury all that may reasonably assist them in the determination of guilt against the danger that they will substitute emotion for reason as the basis of their verdict.

In the present case one of the crucial questions was whether Carey's wounds were caused by the flex-handle wrench found in Edgar Slough, and the colored slides graphically showed the nature of these wounds. The autopsy surgeon used the slides to point out that the wounds must have been inflicted by an instrument that was hard, had smooth edges, and was at least six inches in length, and that the wounds could have been caused by the wrench. He pointed also to certain irregularities in the wounds, stating that they could correspond to an irregularity in the wrench, and that these irregularities were probably more accurately depicted in the slides than in his blackboard diagrams. In these circumstances the court did not abuse its discretion in admitting the slides in evidence, particularly since it carefully warned the jury against allowing the slides to prejudice them against defendant.

The court did commit error, however, in not excluding

a statement by one Bennett, a man who had also been in the Log Cabin and was an important suspect in the case, that he had been willing to take a lie detector test. The court ordered stricken his further testimony that, ''and some other people wouldn't take [such a test] . . .,'' but in view of the testimony the court permitted to stand, the implication survived that defendant had refused to take a lie detector test and that his refusal furnished some evidence of guilty knowledge. Lie detector tests do not as yet have enough reliability to justify the admission of expert testimony based on their results. (*People* v. *Wochnick*, 98 Cal.App.2d 124, 126-128 [219 P.2d 70]; *People* v. *Porter*, 99 Cal.App.2d 506, 510-511 [222 P.2d 151].) It therefore follows that a suspect's willingness or unwillingness to take such a test is likewise without enough probative value to justify its admission. The suspect may refuse to take the test, not because he fears that it will reveal consciousness of guilt, but because it may record as a lie what is in fact the truth. A guilty suspect, on the other hand, may be willing to hazard the test in the hope that it will erroneously record innocence, knowing that even if it does not the results cannot be used as evidence against him.

Defendant next contends that it was error to deny him the right to inspect a document used in the cross-examination of his wife. Mrs. Carter stated on cross-examination that she could not remember if defendant was wearing a red cap when he left the house on the morning of September 29th. The prosecutor then asked her if she remembered being interviewed by the sheriff on September 30th when a stenographer was present, and read from the stenographer's transcript questions put to Mrs. Carter, and her answer that she believed defendant had been wearing a cap. Defense counsel requested and was denied the right to inspect the transcript.

We have recently held that the defendant in a criminal case can compel production when it becomes clear during the course of a trial that the prosecution has in its possession relevant and material evidence that is not confidential, because ''the state has no interest in denying the accused access to all evidence that can throw light on issues in the case. . . .'' (*People* v. *Riser*, 47 Cal.2d 566, 586 [305 P.2d 1].) We were there concerned with the defendant's right to inspect statements that he reasonably believed could be used to impeach the prosecution's witnesses, but the reasons for the decision apply with equal force to a statement the prosecution has used in impeaching the defendant's witness and that the de-

fendant now seeks to inspect for the purpose of rehabilitation. The prosecutor may read to the jury extracts from the transcript selected with an eye to putting the witness in the worst possible light by emphasizing the gap between his prior statement and his present testimony. It is clearly unfair to deny the defendant an opportunity to show that the extracts have been taken out of context, and that when read with other parts of the statement the alleged inconsistency disappears. To be effective such an opportunity must include the right to see the transcript the prosecution has used; the witness' memory of what he said is not enough. (See *People* v. *Stevenson*, 103 Cal.App. 82, 88-92 [284 P. 487] ; *Meadors* v. *Commonwealth*, 281 Ky. 622 [136 S.W.2d 1066, 1068-1069] ; 6 Wigmore, Evidence 477 (3d ed. 1940).)

On rebuttal the prosecution was allowed to introduce in evidence the red cap found in Edgar Slough. Defendant contends that by withholding this important evidence instead of presenting it as part of its case in chief, the prosecution gained an unfair advantage over defendant. The prosecution contends in reply that since defendant denied on the stand that he had been to Edgar Slough or left the wallet or wrench there, the cap was properly admitted to rebut this testimony or impeach defendant's credibility.

 Section 1093, subdivision 4, of the Penal Code provides that after the defendant has offered his evidence, the prosecution may then offer ''rebutting testimony only, unless the court, for good reason, in furtherance of justice . . .'' permits it to offer evidence upon its original case. In a sense all evidence that tends to establish the defendant's guilt over his protestations of innocence rebuts the defendant's case, but it is not all rebuttal evidence within the purpose of section 1093, subdivision 4. The purpose of the restriction in that section is to assure an orderly presentation of evidence so that the trier of fact will not be confused; to prevent a party from unduly magnifying certain evidence by dramatically introducing it late in the trial; and to avoid any unfair surprise that may result when a party who thinks he has met his opponent's case is suddenly confronted at the end of trial with an additional piece of crucial evidence. Thus proper rebuttal evidence does not include a material part of the case in the prosecution's possession that tends to establish the defendant's commission of the crime. It is restricted to evidence made necessary by the defendant's case in the sense that he has introduced new evidence or made assertions that

were not implicit in his denial of guilt. (See *People* v. *Byrd,* 42 Cal.2d 200, 211-212 [266 P.2d 505], cert. denied, 348 U.S. 848 [75 S.Ct. 73, 99 L.Ed. 668]; *People* v. *Nye,* 38 Cal.2d 34, 38-39 [237 P.2d 1]; *People* v. *Avery,* 35 Cal.2d 487, 491 [218 P.2d 527]; 6 Wigmore, Evidence 510-511, 516 (3d ed. 1940).)

A defendant's reiterated denial of guilt and the principal facts that purportedly establish it does not justify the prosecution's introduction of new evidence to establish that which defendant would clearly have denied from the start.

The red cap found in Edgar Slough was crucial evidence tending to show that defendant had put the wallet and wrench in the slough and therefore had beaten and robbed Carey. Defendant's plea made it clear that he would not admit having gone to the slough, and his denial on the stand furnished no new matter for rebuttal. The evidence should have been put in as part of the case in chief. (See *People* v. *Rodriguez,* 58 Cal.App.2d 415, 418-419 [136 P.2d 626].)

Changes in the order of proof called for by section 1093 can be made within the sound discretion of the trial court. (*Cf. People* v. *Avery,* 35 Cal.2d 487, 491 [218 P.2d 527].) In the present case, however, the prosecution offers no reason why the cap could not have been introduced in chief, but since defendant did not make completely clear to the trial court the objection that he now argues, we would not be justified in finding that there has been an abuse of discretion. On the retrial of this case an order of proof will no doubt be observed that is consonant with the purposes of section 1093.

Defendant next contends that the court abused its discretion in denying his motion to reopen the case to introduce evidence that on the 11th of October a red cap, similar to the one found in Edgar Slough and to the one owned by defendant, had been found on the corner of Fifth Street and Esplanade in Chico on the route defendant had taken from the Log Cabin to his house.

The record is not altogether clear whether this was a motion to reopen or a motion for a continuance. During the extended discussion in chambers there were several references to a possible continuance, but defendant's counsel early stated, "Now I would have to request that I be permitted to reopen to explore on surrebuttal the finding of this hat," and in formally denying defendant's motion the court stated, "Under the circumstances, I am denying the motion to reopen at this

time.'' It does not appear that for defendant's purposes a continuance was essential. The important thing was to put before the jury the fact that a second red cap, similar to the one worn by defendant, had been found on the corner of Fifth and Esplanade on October 11th. The district attorney himself suggested that a stipulation of these facts could perhaps be worked out, and indeed they were not in dispute. Even had a short continuance proved necessary to enable defendant to put the facts before the jury, it should have been granted.

The finding of the second cap was highly relevant; it might even have become a decisive consideration in defendant's favor. The trial court itself declared, upon the district attorney's argument that the finding of the second cap was irrelevant, ''But one of the key circumstances in your case is a red hat.'' The prosecution relied heavily on the fact that a red cap similar to the one worn by defendant had been found with the wrench and Carey's wallet in Edgar Slough in November. Had the jury known of the finding of the second red cap, the probative value of the first might have been sharply reduced.

During the discussion in chambers the sheriff produced a red cap found in the evidence room of his office. The fact that this cap could not at that moment be conclusively identified as the cap found on the corner of Fifth and Esplanade was no reason to deny defendant's motion. Defendant had only to show that a red cap had been found, not to produce any particular red cap. Moreover, any confusion as to the identity of the cap was attributable to the sheriff's office, not to defendant. After the red cap was found at Fifth and Esplanade, it was sent to Dr. Kirk to be tested for blood stains. He found none. The cap was then returned to Deputy Longacre in the sheriff's office who presumably put it in the evidence room. Soon after he retired from police work. A few weeks before trial the cap could not be found, but after a search of the evidence room a red cap was found; it was this cap that the sheriff produced in chambers. The district attorney suggested that it could be the one found at Fifth and Esplanade, or that it could be another. The sheriff could not recall that any third red cap had come into his office. There was nothing to indicate that the cap produced was not the original red cap.

The court was not justified in denying defendant's motion on the ground that his counsel knew about the second

red cap before trial but took no steps to obtain it. The extent of counsel's knowledge appears from the following extracts from the record:

"MR. STONE: But I must state to the Court that only this morning did I discover—was I informed for the first time that the sheriff's office of Butte County, between September 29 and the date of this trial—and I don't know the date—found or had turned in to them in Chico a red baseball cap, one that is not in evidence, and that there has been no showing—there has been no reason for it whatsoever. It was found, as I understand it, at 5th and the Esplanade, which is between the Log Cabin and the defendant's residence on the route which the defendant himself says he took. I am also informed that it is of the same type and description as the one presently in evidence. In other words, it is red, it is a baseball cap, and also that it is greasy''

And later in the discussion——

"MR. STONE: Sometime back Mr. Carter in my discussion with him stated to me that he had been questioned about a hat, that there was no statement by Mr. Carter to me as to where the hat was found, when it was found. He told me that he had not been shown the hat. I had no way of knowing in view of the fact that he had told me there was no hat shown to him as to whether or not this was simply an effort——.

"THE COURT: Was 5th and Esplanade mentioned?

"MR. STONE: Not to my recollection, no, Your Honor.

"MR. LYDE: I wonder if the Court would ask whether or not he mentioned a street.

"MR. STONE: I believe, as I recall, what Mr. Carter told me, he said it was found uptown.

"MR. LYDE: Well, there, you see. We never told him we found the one in the slough. At least I don't believe I did. Bruce may have. Go ahead, Mr. Stone.

"MR. STONE: But I would want to simply point out to the Court that when Mr. Carter told me that he had not been shown the hat that I thought this perhaps was simply an effort in view of the statements made by Cox, which appeared in the newspaper, a statement by Beer—and I had talked to Beer and Cox—and he had a hat on—I thought perhaps this was an attempt to simply by the prosecution to endeavor to get a confession out of the defendant and I put no weight on this thing at all. Now, you also recall, Your Honor, that—. Well, I won't go any further. I have answered as best I can.''

In some circumstances it might be proper to find that such

information imposes on counsel the burden of pursuing every evidentiary possibility on pain of being denied the right to reopen for later discovered evidence. In the present case, however, because of the closeness of the proof, the vital character of the evidence defendant sought to introduce, the seriousness of the charge, and the absence of any substantial considerations weighing against reopening the case, it was clearly improper.

Neither defendant nor his counsel knew that a red cap similar to defendant's had been found on the corner of Fifth and Esplanade. The prosecution did not so advise them. They had only fragmentary information that some cap had been mentioned by the police. They would understandably not appreciate the significance of this information if, as seems likely, it came at a time antedating the discovery of the red cap in the slough, when it had not yet become important for defendant to prove that the red cap in the slough was not his cap.

Moreover, there were no substantial reasons against reopening the case. Defendant had only just rested, argument had not begun and the jury had not been instructed, and it does not appear that granting defendant's request would have entailed any great inconvenience. In a trial that had already consumed 13 days, it was not unreasonable to request an extension of a few hours to put before the jury evidence that in justice should have been considered, as the trial court itself must have recognized when it said in reference to informing the jury of the finding of the second cap, "I don't think I could deprive him [defendant] of that opportunity and still give him a fair trial." This decisive consideration should have overcome arguments based on the notion that a criminal trial is a rigorously adversary proceeding in which a party must seize his opportunities when presented or forever lose them.

*People* v. *Buckowski*, 37 Cal.2d 629 [233 P.2d 912], and *People* v. *Fountain*, 170 Cal. 460 [150 P. 341], do not support the trial court's ruling in the present case. The defendants in those cases had in their possession long before trial as much information as the prosecution, and all that was necessary to enable them to obtain the evidence they wished. In each case the defendant sought to postpone indefinitely the beginning of trial rather than to reopen to admit specific evidence already at hand. The materiality of the evidence that each claimed could be found during a continuance was

remote and speculative, whereas the evidence defendant sought to introduce in the present case was relevant and material. Finally, in the Buckowski case, where the question was whether the defendant had committed the homicide, the evidence against him was overwhelming, whereas in the present case the evidence was such that additional evidence might well have affected the result.

Defendant's final objections go to the court's failure to give certain instructions. Defendant contends that the court should have instructed on the distinction between robbery and burglary, because the jury knew that defendant had been convicted of burglary in another state and might have thought that burglary like robbery involved violence against the person of another. This argument implies that knowledge of defendant's conviction could directly affect the jury's determination of guilt. The court carefully instructed the jury, however, that it could take defendant's prior conviction into account only in assessing his credibility, and there is no reason to think that it did not obey this instruction. On the issue of credibility, it was irrelevant whether or not defendant's prior conviction had been for a crime of violence.

Nor was there error in the court's failure to instruct that the homicide was not in the perpetration of a robbery if the intent to rob arose after the attack on the deceased. At no time during the trial did defendant rely on the theory that such an instruction would have embodied. He did not contend that he thought of robbing Carey only after attacking him; on the contrary he denied either attacking or robbing him. In each case that he invokes, *People* v. *Hudson,* 45 Cal. 2d 121, 124-126 [287 P.2d 497], and *People* v. *Carnine,* 41 Cal. 2d 384, 387-392 [260 P.2d 16], the defendant admitted killing and robbing the victim and relied only on the defense that the intent to rob had not been formed until after the homicide. The court in the present case was not required to give an instruction that would have had no foundation in the evidence or in any theory on which the case was tried. (See *People* v. *Eggers,* 30 Cal.2d 676, 687 [185 P.2d 1], cert. denied, 333 U.S. 858 [68 S.Ct. 728, 92 L.Ed. 1138].)

The court refused to give an instruction that in a case resting wholly on circumstantial evidence, "each fact which is essential to complete a chain of circumstances that will establish the defendant's guilt must be proved beyond a reasonable doubt." More, it positively informed the jury that the law was otherwise. In *People* v. *Watson,* 46 Cal.2d 818, 830-831

[299 P.2d 243], we held that the refusal to give such an instruction was error. A fortiori there was error here.

Defendant contends that still other errors were committed by the court and that there was misconduct on the part of the district attorney. Since the acts complained of are not likely to attend a new trial, it is not necessary to consider them here. On the basis of the errors considered earlier it is clear that defendant has not had a fair trial. The closeness of the proof indicates that absent these errors the jury might have reached a different verdict.

The judgment and order are reversed.

Gibson, C. J., concurred.

CARTER, J.—I concur in the judgment of reversal and generally in the reasoning set forth in the majority opinion. I feel, however, that error also was committed in the admission of Dr. Kirk's testimony concerning his experiments with the pattern made by blood spattering from an object made of wood, sponge rubber and a thin plastic sheet. The admission of such testimony invaded the province of the jury as it was based on conditions far removed from those actually existing at the time the crime was committed. Such testimony from a person as noted in criminology as Dr. Kirk could have had no other effect than to impress and prejudice the jury particularly in a case as closely balanced as the one here under consideration.

This court held in *People* v. *Woon Tuck Wo,* 120 Cal. 294, 296-297 [52 P. 833], that unless such experiments are shown to have been made under essentially the same conditions that existed in the case on trial, the tendency is to confuse and mislead rather than enlighten the jury. It most certainly cannot be said that an object made of wood, sponge rubber and a plastic sheet constituted the same thing as a human head. Further, as noted in the majority opinion, the prosecution made no attempt to show that because certain spots were produced by a certain cause in the experiments, similar spots on defendant's trousers or on the floor of the card room must have been produced by a similar cause. "Evidence of this kind should be received with caution, and only be admitted when it is obvious to the court from the nature of the experiments that the jury will be enlightened rather than confused. In many circumstances a slight change in the conditions under which the experiment is made will so distort the result as to

wholly destroy its value as evidence, and make it harmful rather than helpful." (*People* v. *Wagner*, 29 Cal.App. 363, 369-370 [155 P. 649]; see also *People* v. *Ely*, 203 Cal. 628 [265 P. 818]; *People* v. *Parker*, 4 Cal.App.2d 421, 424 [40 P.2d 836]; *McGough* v. *Hendrickson*, 58 Cal.App.2d 60 [136 P.2d 110].)

Defendant's story was that the spots on his clothing were due to blood spraying on him as he handled the deceased's body when he discovered it after the beating. Dr. Kirk's testimony was to the effect that the blood could not have gotten on defendant in that manner but could have gotten there only if he had administered the beating. It was the jury's prerogative to draw its own conclusion from the evidence without expert testimony based on totally dissimilar facts.

For this reason, as well as those stated in the majority opinion, I concur in the reversal of the judgment.

Schauer, J., concurred.

SPENCE, J., Concurring and Dissenting.—I agree with certain portions of the opinion prepared by Mr. Justice Traynor, but I disagree with other portions and dissent from the conclusion that the judgment and order denying a new trial should be reversed.

More specifically, I agree with those portions which declare certain of defendant's claims of error to be without merit. On the other hand, I cannot agree with certain portions of the discussion which sustain some of defendant's claims of prejudicial error. It would serve no useful purpose, however, to enter into a discussion of each of the several claims, but a reference to one such claim appears appropriate.

One of defendant's principal claims of prejudicial error rests upon the failure of the trial court to give defendant's requested instruction to the effect that in a case resting wholly upon circumstantial evidence, "each fact which is essential to complete a chain of circumstances that will establish the defendant's guilt must be proved beyond a reasonable doubt." This refusal is declared by Mr. Justice Traynor to constitute prejudicial error. I cannot agree.

This court held in *People* v. *Watson*, 46 Cal.2d 818, 830-831 [299 P.2d 243], that the requested instruction was a proper instruction, but that in the light of the instructions given, there was no prejudicial error in the failure to give it. The same is true here. The trial court gave numerous instructions

in this general field including CALJIC 21, 24, 25 and 26. Additionally, the trial court specifically instructed: ''Before the jury may find a defendant guilty, the law requires that all of the essential elements of the crime charged, and each fact necessary to establish the commission of the crime by the defendant must be proved beyond a reasonable doubt and to a moral certainty.'' The quoted instruction embodies the principle found in defendant's requested instruction, and the subject was therefore adequately covered.

Furthermore, I find nothing in the record to justify the statement that the trial court ''positively informed the jury that the law was otherwise.'' During a colloquy between court and counsel on the voir dire examination of the jurors, and relating to an objection to a lengthy question on another point, the trial court did make a statement that ''Each circumstance does not require proof to a moral certainty and beyond a reasonable doubt.'' Counsel for defendant immediately said: ''That wasn't my point. That was not the point. Perhaps I can state it in another way.'' The trial court then said: ''I could not have answered the question yes or no without numerous other factors to be considered.'' Counsel for defendant then reframed his lengthy question, and the reframed question was answered without objection.

In my opinion, the trial court's statement was correct and in any event, it could not have been reasonably construed as contrary to the trial court's formal instructions on the subject under discussion. It has never been held that ''each circumstance,'' as distinguished from ''each fact which is essential to complete a chain of circumstances that will establish the defendant's guilt'' (as stated in the requested instruction) or ''each fact necessary to establish the commission of the crime by the defendant'' (as stated in the given instruction) must be proved beyond a reasonable doubt. Certain facts or circumstances may appear in a lengthy record, which facts and circumstances may not be essential to the determination of the guilt of a defendant; but it is only the ''essential'' or ''necessary'' facts in the chain of circumstances which must be proved by the quantum of proof required to sustain a criminal conviction. As above indicated, the trial court did instruct the jury that ''each fact necessary to establish the commission of the crime by the defendant must be proved beyond a reasonable doubt and to a moral certainty.'' I therefore find no prejudicial error in the failure to give the requested instruction.

It may be assumed that in the lengthy record covering more than 1,700 pages, some error may be found. A reading of that record convinces me, however, that the evidence presented a chain of circumstances so tightly linked about defendant that there is not the slightest doubt concerning defendant's guilt of the cold-blooded murder of his 77-year-old victim in the perpetration of robbery. I find no error of such nature as to sustain a claim that there was any likelihood that a result more favorable to defendant would have been reached in the event that such error had not occurred. Under these circumstances, I believe that this is a typical case for the application of the constitutional mandate, which provides that no reversal shall be ordered "unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Const., art. VI, § 4½; *People* v. *Watson, supra,* 46 Cal.2d 818, 837-838.)

I would affirm the judgment of conviction and the order denying a new trial.

Shenk, J., and McComb, J., concurred.

Respondent's petition for a rehearing was denied July 16, 1957. Shenk, J., Spence, J., and McComb, J., were of the opinion that the petition should be granted.