37 Cal.Rptr. 529]

[Crim. No. 8819. Second Dist., Div. One. Dec. 2, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. AURELIO JUAN NINO, Defendant and Appellant.

2

Saul Cohen, under appointment by the District Court of Appeal, for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Jack K. Weber, Deputy Attorney General, for Plaintiff and Respondent.

WOOD, P. J.—Defendant Aurelio Nino and one Doroteo Mojarro were convicted, in a trial by jury, of violating section 10851 of the Vehicle Code (driving automobile without consent of owner). Nino admitted an allegation of the information that he had been convicted previously of a felony (driving automobile without consent of owner). Nino appeals from the judgment.

On August 3, 1962, about noon, Mrs. Lewis left her 1960 Pontiac automobile, bearing license No. SWS 829, in a public parking lot in Los Angeles. When she returned to the lot about 1:30 p.m., her automobile was not there. She had not given anyone permission to take the automobile.

On August 4, about 3:20 a.m., Officers Higgins and Werth, who were in an unmarked police car and were southbound on Alameda Street, stopped at 16th Street for a red traffic light. While they were there a 1960 Pontiac car, bearing license No. SWS 829, which was also southbound, stopped at the left side of the officers' car and awaited the change of signal. After the signal changed to green, the officers followed the Pontiac to a place a few feet south of 24th Street, where they turned a red spotlight on the occupants of the Pontiac. At that time the defendant Nino, who was driving the Pontiac, looked in the rear-view mirror in the direction of the officers' car, and then increased his speed to approximately 75 miles an hour and ran through red traffic lights at 41st and 44th Streets. When the Pontiac turned west on 50th Street the officers lost sight of it. The officers proceeded on 50th Street to Long Beach Boulevard and then north on Long Beach to 47th Place where they stopped for a red light. While they were there the same Pontiac came up beside the officers' car, and the two defendants therein looked toward the officers. Then the Pontiac went through the red light at 47th Place. The officers pursued the car as it speeded up to approximately 75

miles an hour and ran through red lights at 44th and 41st Streets. As the Pontiac approached 24th Street, a freight train which was proceeding eastward along 24th street was blocking the traffic on Long Beach Boulevard. The Pontiac stopped at 24th Street, and the two defendants alighted from the Pontiac, and ran alongside the train. The officers ran after the defendants. The defendants jumped on the train. Officer Werth also got on the train. Defendants jumped off the moving train near Alameda Street and went south on that street. Officer Werth jumped off the train at Alameda and ran after the defendants for about a block. At that time and place many police cars were arriving, in response to radio calls for help which had been made by Officers Higgins and Werth while they were in their police car. Soon thereafter the defendants were arrested.

Prior to the time that Officers Higgins and Werth first saw the Pontiac (at Alameda and 16th), they had had a report that a car of that description had been stolen. Those officers testified that the defendants were the men who were in the Pontiac, and that the defendant Nino was driving it.

It was established that the Pontiac was owned by Mrs. Lewis, who had left it at the parking lot.

Officer Lomen, an investigating officer, testified that in a conversation with defendants, about three days after their arrests, that Nino said that he had never seen Mojarro before they were arrested, and that Mojarro said that he had never seen Nino before the arrests.

A part of the asserted defense of both defendants was alibi evidence. Mr. Rios, called as a witness by defendants, testified that he resided at 1726 East 41st Place (3 or 4 miles from the parking lot) ; that the defendants were in his home on said August 3, about 12:30 p.m., and at that time he introduced Nino to Mojarro; that both defendants remained there until approximately 3 a.m. on August 4.

Mrs. Rios, called as a witness by defendants, testified that the defendants came to her home (same as Mr. Rios' home) about noon on Thursday (August 2) and stayed there until approximately 3 a.m.

Defendant Nino testified as follows: That on said August 4 he left Mr. and Mrs. Rios' home about 3 a.m. When he was arrested in the early morning of August 4 he was walking on Santa Barbara Avenue for the purpose of getting some fresh air. He was alone and had not been running. While he was on Santa Barbara Avenue, he heard a car coming but he just

kept walking, and the officers put a shotgun out the car window and told him to stop. An officer kept asking him where his partner was, but he did not answer. He (Nino) did not have any knowledge of a theft of a 1960 Pontiac from a parking lot. At the time of the arrest, Officer Higgins hit him three times on the mouth with a flashlight and hit him eight times on his side with a blackjack. A few days after the arrest, he told an officer (Officer Lomen) that he did not know Mojarro. When he said he did not know Mojarro, he did not mean exactly that he did not know him, but the point was that he really didn't know what he was in or what Mojarro was in, and he didn't want to say that he knew somebody, and then be implicated in something that he did not have any responsibility for. He did not do any running that night. He (Nino) was not in, nor near, a 1960 Pontiac car that evening. In 1958 he was convicted of a felony, driving an automobile without the consent of the owner.

Defendant Mojarro testified as follows: When he was arrested about 4 o'clock in the morning he was on his way home from a hamburger stand. He was intoxicated, and when he saw the police coming down the street, with light flashing, he did not want to get picked up for being drunk or anything, and for that reason he went into a driveway. He told Officer Lomen that he did not know Nino, because he was scared and did not want to get involved in anything. He did not take the Pontiac and was not in it. On cross-examination, he said that he did not touch the Pontiac. He was shown a signature and a palmprint, which were on exhibit 2 for identification, and he was asked whether the signature was his and whether the print was a print of the palm of his right hand. He answered both questions in the affirmative.

Officer Walmsley, an expert in comparing fingerprints, who was called by the prosecution as a rebuttal witness, testified that he obtained a palmprint (exhibit 3 for identification) from a chrome strip on the right rear door of the Pontiac; that the palmprint which he obtained (exhibit 3 for identification) is the same as the palmprint on exhibit 2 for identification (the admitted palmprint of defendant Mojarro). Defendants' objections to the introduction of the palmprints in evidence were overruled. One of the objections was to the effect that it was improper to introduce the evidence on rebuttal.

Appellant (Nino) contends that the court erred in receiving as rebuttal evidence the palmprint which was obtained by Officer Walmsley from the Pontiac; and that the

court erred in not giving an instruction to the effect that the evidence as to the palmprint of Mojarro was not admissible as against Nino. Appellant argues that Mojarro's palmprint, which was taken from the Pontiac, was properly a part of the prosecution's case in chief, and that the withholding of it for rebuttal evidence was improper and in violation of section 1093 of the Penal Code, which sets forth the order of proof. That section provides that after the defendant has offered his evidence, the prosecution may then ''offer rebutting testimony only, unless the Court, for good reason, in furtherance of justice,'' permits it to offer evidence upon its original case.

The rule to the effect that after the defendant has offered his evidence the prosecution may offer rebutting evidence only is stated and explained in *People* v. *Carter,* 48 Cal.2d 737, 753 [312 P.2d 665]. In that case it is said: ''The purpose of the restriction in that section [Pen. Code, § 1093] is to assure an orderly presentation of evidence so that the trier of fact will not be confused; to prevent a party from unduly magnifying certain evidence by dramatically introducing it late in the trial; and to avoid any unfair surprise that may result when a party who thinks he has met his opponent's case is suddenly confronted at the end of trial with an additional piece of crucial evidence. Thus proper rebuttal evidence does not include a material part of the case in the prosecution's possession that tends to establish the defendant's commission of the crime. It is restricted to evidence made necessary by the defendant's case in the sense that he has introduced new evidence or made assertions that were not implicit in his denial of guilt.''

In the present case, in order to understand the circumstances under which the palmprint from the Pontiac was offered in evidence during rebuttal, reference should be made to the sequence of events in the trial pertaining to fingerprints. During the direct examination of Officer Higgins by the prosecution, in its case in chief, the prosecutor asked him whether fingerprints were taken from the Pontiac. He replied, ''Not to my knowledge.'' On the next day, during cross-examination of that officer, counsel for defendants asked whether, since his testimony of the day before, he had any further knowledge as to whether any fingerprints had been taken from the Pontiac. He replied that he had been told that prints had been taken. On redirect examination of that officer, the prosecutor asked whether he had been told

that the prints had been identified. He replied in the affirmative. After the cross-examination of Mojarro had been commenced, defendants' counsel requested permission to discuss a matter out of the presence of the jury. Thereupon, in chambers, defendants' counsel said that while he was leaving the courtroom (apparently during a recess) he noticed that an officer had come into the courtroom and handed to the prosecutor what appeared to be a fingerprint card and a photograph of prints, and that the officer said they had found the print on the car. Defendants' counsel also said that he believed that the jurors were aware that the prosecution had evidence of prints taken from the car; and then he made a motion for an order declaring a mistrial because such evidence was properly a part of the case in chief. The prosecutor replied that he knew before noon of that day that the palmprint of Mojarro was found on the Pontiac, and the reason he had not presented it in the case in chief was that the officer who had rolled the admitted print (the 1958 palmprint of Mojarro in another case) was out of the city on vacation; that he (prosecutor) could not anticipate that Mojarro would fabricate his testimony, but when Mojarro denied being anywhere near the Pontiac, he (prosecutor) turned to an officer to get the exhibits and the officer said that Officer Walmsley, the fingerprint man, was then in the courtroom—there was nothing said about the identity of the fingerprints. The prosecutor also said that he approached counsel for defendant intending to show him Mojarro's signed palmprint before showing it to the witness; and that after Mojarro had finished testifying, the prosecutor intended to offer, by way of rebuttal, the testimony of Officer Walmsley who took the palmprint from the Pontiac. In denying the motion for an order declaring a mistrial, the judge said: "I think it is proper rebuttal evidence in view of the testimony of Mojarro, which might have been suspected perhaps in the last hour or two of this trial, but which could not be predicted prior thereto with any degree of accuracy."

Of course, the evidence regarding Mojarro's palmprint being on the Pontiac was admissible evidence. It appears that the prosecutor did not know, prior to the time he closed his case in chief, that such a print was available, but he was willing to rest his case in chief, regarding identity of the defendants, upon the testimony of the officers who pursued the defendants, by automobile and on foot, for a considerable distance and who saw them in the Pontiac, saw them get out of it, run away, and jump on the train. It would seem that under such circumstances the prosecutor, during the presen-

tation of his case in chief, might have anticipated that Mojarro would attempt to explain his presence in the Pontiac, but it would not seem that the prosecutor should have anticipated that Mojarro would deny that he was in the car. When Mojarro testified that he was certain that he did not touch the Pontiac, the prosecutor was confronted with the question whether he should refrain from offering the concededly admissible evidence of Mojarro's palmprint on the Pontiac. In the discussion in chambers regarding the print, the prosecutor said that by reason of Mojarro's fabrication of his testimony—that he did not touch the car, he (prosecutor) would offer, by way of rebuttal, testimony that Mojarro's palmprint was on the car. It is apparent that the matter of the palmprint was not reserved for rebuttal in order to emphasize it late in the trial or to surprise the defendant. ▆ The order of proof rests in the sound discretion of the trial court. (*People* v. *Avery*, 35 Cal.2d 487, 491 [218 P.2d 527].) ▆ During the discussion in chambers (before the presentation of rebuttal evidence), the trial judge stated that he thought the palmprint evidence was proper rebuttal evidence in view of the testimony of Mojarro. Under the circumstances herein, the court did not err in receiving as rebuttal evidence the palmprint of Mojarro which was obtained from the Pontiac.

▆ As above stated, appellant also contends that the court erred in not giving an instruction to the effect that evidence as to the palmprint of Mojarro was not admissible as against appellant (Nino). Such an instruction was not requested by Nino or anyone. The court was not required to so instruct the jury.

The two officers who pursued the defendants identified Nino as the driver of the Pontiac. They saw him get out of the car and run away. He admitted that he testified falsely when he said that he had not seen Mojarro prior to the arrests. The alibi evidence was uncertain—one of the witnesses regarding the alibi said that the defendants were at the Rios' home on August 3; and the other such witness, after saying that defendants were there on August 3, said that she was certain that defendants were there on Thursday (which was August 2). The evidence of guilt was strong.

The defendants were accorded a fair trial.

The judgment is affirmed.

Fourt, J., and Lillie, J., concurred.

A petition for a rehearing was denied December 20, 1963.