[Crim. No. 13996.   Second Dist., Div. One.   Apr. 9, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. FRANK HERNANDEZ AMBRIZ, Defendant and Appellant.

Jesse L. Halpern, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Roger E. Venturi and Talmadge R. Jones, Deputy Attorneys General, for Plaintiff and Respondent.

WOOD, P. J.—Defendant was accused of armed robbery. He admitted allegations of the information that he had been convicted previously of two felonies (discharging firearm at inhabited dwelling; escape). In a jury trial, he was found guilty as charged. He appeals from the judgment and from the order denying his motion for a new trial.

Appellant contends that it was prejudicial error to receive certain evidence in rebuttal.

On March 12, 1967, about 5 p.m., Mr. Corbett, an employee in a liquor store in Norwalk, saw the defendant "walking around" the store building, and saw him peek in a window approximately five seconds. Mr. Corbett went outside the store, and saw a car leave. He obtained the license number and a description of the car.

About 6 p.m. on said day the defendant went into the store "quite fast," pulled a gun from his pocket, pointed it at Miss DiGiacomo, an employee who was at the cashier's desk, and said, "Give me the money." She opened the cash register and gave him a $10-bill. He said, "Give me the fifty." She replied that she did not have a fifty-dollar bill. He said, "Give me the fifty." When she again said that she did not have a "fifty," he said, "Yes you do." He took all the bills and change from the cash register. Miss DiGiacomo testified that the register contained between $30 and $35, consisting of one $10-bill, two or three $5-bills, and about ten $1-bills. After defendant had taken the money, he said: "Don't move. Just stand there." He left the store, and she told Mr. Corbett, who was in the rear of the store, to call the police. About 30 minutes before defendant entered the store, Miss DiGiacomo had received a $50-bill from a customer, and she had not put the bill in the cash register.

Miss DiGiacomo testified, on the People's case in chief, that defendant was the man who robbed her; that she saw "very distinctly" a tattoo on defendant's left hand during the robbery when the defendant used that hand in taking the money from the register. She identified defendant on two occasions at the police station and he then had the "same tattoo." During the robbery she also noticed his hair, moustache, general appearance, and build.

About 6:05 p.m. Officers Quintana and Ostermeier, who were

in a patrol car, received information on the radio regarding the robbery. Some of the information was that two suspects were in a 1950 or 1951 grey Chevrolet bearing California license plate number HOW 361, and that one of the suspects was "a male Caucasian of Latin descent, approximately 32 to 35 years old, about five feet ten, medium build with a moustache and numerous tattoos on both arms." The officers immediately communicated with the Department of Motor Vehicles and ascertained that the registered owner of said vehicle was Paul Ramirez who resided at 12417 Pioneer Boulevard in Norwalk. The officers went to that address and saw the Chevrolet car which was parked next to the house, and the door of the car on the driver-side was open. They touched the "engine compartment," of the car, and observed that it was warm. When they knocked on the front door of the house, a male Caucasian of Latin descent came to the door, and they told him that they were investigating a robbery, and they "asked him who had just driven the Chevrolet into the driveway." He replied that his brother-in-law, Frank Ramirez, had just driven the car in. In response to a further question, he said that his brother-in-law was not there. They requested permission to "check the premises," and the man said: "He [brother-in-law] left here ten minutes ago. You can look if you want to." The officers went into the house and found the defendant lying on a bed in a bedroom—he fit the description of a robbery suspect as to whom they had received information by radio. Officer Quintana knew the defendant "on sight," having had "previous dealings with him," and knew that he was Frank Ambriz. Defendant was arrested and was advised of his constitutional rights. The officers searched the bedroom and found $34 between the mattress and the innerspring of a child's bed or crib. The $34 consisted of one $10-bill, three $5-bills, and nine $1-bills. The other occupants of the house, four men and three or four women, denied "any knowledge" of the money. Two of the men, who were of Latin descent, were also arrested.

About 7 p.m. (one hour after robbery), Mr. Corbett and Miss DiGiacomo viewed a lineup at the police station. Among the men in the lineup were the defendant and the two men who had been arrested at the house. Mr. Corbett identified the defendant as the man who peeked into the store window, and Miss DiGiacomo identified him as the man who robbed her. She based her identification, in part, on the tattoo on defendant's left hand.

Defendant testified in substance that he was at the home of

his girl friend (Dora Ramirez) "all day" on March 12, 1967, until 6 p.m., watching television and conversing with her and other persons; he was arrested at his sister's home about five minutes after he had left Dora's home; the Chevrolet can be operated without an ignition key; he drove the Chevrolet on the morning of March 12 and he thought that he had parked it in front of the yard; and when he returned from Dora's home the Chevrolet was not where he left it—it was in the driveway beside the house.

Defendant's sister testified that the money which the officers found in the crib belonged to her; she had not been present when the officers asked the occupants of the house about the money; she keeps money in the crib, but she did not know how much money was in it.

Dora Ramirez, defendant's girl friend, testified that she lived across the street from the house where defendant's sister lived; defendant was at her house "practically all day" on March 12; he was there "all afternoon" until he went to his sister's house about 6 p.m.; and the Chevrolet had been in the driveway all afternoon.

Miss DiGiacomo, called as a witness on rebuttal, testified that she had a very good look at the tattoo on defendant's left hand when he robbed her. The deputy district attorney asked her to describe the tattoo. Defendant objected thereto on the ground that it was improper rebuttal. The objection was overruled. She testified that the tattoo was long and box-shaped—it had two long sides and two short sides—with words written inside the box formed by the sides; and that when the defendant was in the lineup she saw the tattoo on his left hand. The People then requested that the defendant exhibit his left hand to the jury. Defendant objected thereto—stating that there was no requirement that defendant show his arms to the jury. The objection was overruled. The defendant exhibited both of his hands to the jury. (Prior thereto, Officer Ostermeier testified on rebuttal that when defendant was arrested he had a tattoo on his left hand, which tattoo appeared "to be a box" and there was writing in the box.)

■ Appellant contends that the court erred prejudicially in receiving the rebuttal evidence regarding the tattoo in that it was improper rebuttal. He cites (*People* v. *Carter,* 48 Cal. 2d 737 [312 P.2d 665], wherein defendant was convicted of murder, and in the case in chief the prosecution referred to a red cap but did not offer it in evidence at that time, but did introduce it in evidence on rebuttal. In the cited case, the

prosecution (in presenting its case in chief) presented evidence that the victim's wallet, a wrench which had been lent to the defendant, and a red cap, had been found in a slough under a bridge. Defendant testified that he had not beaten or robbed the victim. On rebuttal, the prosecution introduced a red cap in evidence. A contention on appeal was that the rebuttal evidence was received improperly. The judgment therein was reversed on other grounds. With reference to the rebuttal evidence the court referred (on page 753) to section 1093, subdivision 4, of the Penal Code (relating to order of proof), and said (on page 754) that the evidence relating to the cap "should have been put in as part of the case in chief."

In *People* v. *Wein,* 50 Cal.2d 383, 407 [326 P.2d 457], wherein evidence relating to a fingerprint of defendant was received on rebuttal, it was said: "Second, defendant claims that the expert testimony that defendant's fingerprint was found on a glass at the home of one of the victims should not have been received on rebuttal. The prosecution had this information two days prior to the close of its case in chief. Again we come to the question of whether the district attorney or his aides indulged in a proscribed withholding of matter properly belonging in their case in chief. (*People* v. *Carter, supra,* 48 Cal.2d 737, 753-754; *People* v. *Rodriguez, supra,* 58 Cal.App.2d 415, 418-419 [136 P.2d 626].) An affirmative answer seems possible. However, under the facts of this case, a reversal is not warranted. . . . The fingerprint was probably not unduly magnified in significance, since *it merely corroborated the direct testimony of one of the victims.* [Italics added.] It was not as crucial as . . . the defendant's apparel found near where the murder weapon was abandoned and withheld in *People* v. *Carter, supra,* a case resting entirely on circumstantial evidence." (See *People* v. *Alvarez,* 212 Cal.App.2d 406, 409 [28 Cal.Rptr. 141], wherein rebuttal evidence was "corroborative" of evidence in chief.)

In *People* v. *Jeffrey,* 233 Cal.App.2d 279, 281-282 [43 Cal. Rptr. 524], wherein appellant contended that the court committed prejudicial error in receiving rebuttal evidence, it was said: "In the instant case the prosecution had presented in its case in chief ample evidence to justify and support defendant's conviction. Alibi was raised as an issue in the case for the first time by defendant on his direct examination. . . . 'While it is improper for the prosecutor to withhold evidence which is properly a part of his case in chief and offer it after the defense has closed its case, such evidence may be used by

the prosecutor where it comes within the rules of impeachment and may be admitted on rebuttal to meet evidence upon a point put into dispute by the testimony of the defense.' ... The prosecutor having made a clear case before resting 'It was not necessary,' as this court pointed out ... 'for him to anticipate and disprove every possible defense or alibi of the defendant.' ''

In the present case, ample evidence to support the conviction was presented in the case in chief, including direct evidence (testimony by Mr. Corbett and Miss DiGiacomo to the effect that defendant was the man who perpetrated the robbery). In the case in chief, Miss DiGiacomo testified that her identification of defendant was based in part upon her observation of defendant's hair, build, and general appearance, and in part upon her observation of a tattoo on his left hand. No evidence was presented in chief, as to a description of the tattoo. Defendant's defense was predicated solely upon an alleged alibi—that he was at his girl friend's home and had not been using the Chevrolet car when the robbery was perpetrated. It thus appears that the evidence presented on rebuttal as to a description of the tattoo tended to refute defendant's alibi evidence and tended to corroborate the testimony of Miss DiGiacomo, which she gave in chief, that her identification of defendant was based in part upon her observation of a tattoo on defendant's left hand. The court did not err in receiving the rebuttal evidence relating to the tattoo.

The purported appeal from the order denying the motion for a new trial is dismissed.

The judgment is affirmed.

Fourt, J., and Lillie, J., concurred.