Filed 1/27/14  P. v. Boyce CA1/5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

THE PEOPLE,

     Plaintiff and Respondent,

                                  A133912

     v.

                                  (Napa County

DALLAS BRADLEY BOYCE,         Super. Ct. No. CR151431)

     Defendant and Appellant.

_____

In re DALLAS BRADLEY BOYCE,      A139898

     on Habeas Corpus.

_____/

     A jury convicted appellant Dallas B. Boyce of various felonies, including forcible rape (Pen. Code, § 261, subd. (a)(2))[1] and first degree residential burglary (§ 459) and the court sentenced him to state prison.  Appellant appeals.  He contends: (1) the court erred by allowing the prosecution to introduce evidence of his police interview on rebuttal; (2) the jury instructions on the sex offenses "were constitutionally infirm[;]" and (3) the prosecutor committed misconduct during closing argument.  We affirm.

_____

[1]    Unless otherwise noted, all further statutory references are to the Penal Code.  By separate order filed this date, we deny appellant's related petition for writ of habeas corpus (A139898) raising an ineffective assistance of counsel claim.

FACTUAL AND PROCEDURAL BACKGROUND

We provide a brief overview of the facts here.  We provide additional factual and procedural details as germane to the discussion of appellant's specific claims.

***Prosecution Evidence***

A.      Prior Incidents

Tanya T. (Tanya) dated appellant for about six months in 2003 and 2004.  Tanya ended the relationship; the breakup was not amicable and appellant continued to call her after the relationship ended.  Twice, appellant called her at work and told her, "I can see you."  Both times, Tanya looked out her window and saw appellant watching her from the street or the bushes.  During their relationship, appellant never mentioned sleepwalking or sleep-related issues, nor did he ask her to lock the door or hide the keys while they were sleeping.

Early one October 2008 morning, Raina S. (Raina) was awakened by the sound of footsteps outside her bedroom window.  She noticed a screen on the window next to her bedroom was "pulled off a little bit."  Sheriff's deputy Karen Kennedy went to Raina's home at 6:15 a.m. and saw a pick-up truck pull away from the curb near Raina's house.  Kennedy stopped the truck and approached the driver, later identified as appellant.  Kennedy told appellant Raina reported a prowler; in response, appellant said she had texted him that "she needed help and was he going to be around."[2]  Appellant claimed he walked up to the left side of Raina's house and a light went on; he explained that when he saw the light, he went back to his truck and waited for more lights so he knew Raina was awake.  Later, however, appellant told Kennedy he went to Raina's house to invite her to church that evening.  Appellant responded to Kennedy's questions in a logical manner and did not appear confused.

B.      The Jane Doe Incident

In April 2010, Jane Doe was living alone in a house in Napa.  The back laundry room windows, which faced the backyard, did not have blinds.  The other windows had

---

[2]      Although Raina and appellant were friends, he had not been to her house in "years" and she did not have his phone number.  Raina did not text appellant.

2

venetian blinds, which Doe kept closed. From the back windows, one could see into Doe's laundry room, kitchen, and living room. Doe frequently walked to work and to Safeway.

On April 28, 2010, appellant called the police, claiming he was suicidal. The police issued a "be-on-the-lookout" for appellant. Early that afternoon, Doe went home from work. She drank two beers — uncommon for her — because she was depressed and angry. She had a difficult day at work and was "devastated" over the recent death of her dog. At 4:30 p.m., Doe walked to Safeway and bought wine and groceries to prepare dinner for a friend who was coming to her house that evening. Doe walked home, drank a glass of wine, and prepared dinner. Doe and her friend ate dinner and finished the bottle of wine Doe bought at Safeway. Then they went to a music club, where Doe drank two more beers. The two friends returned to Doe's home at 10:00 p.m. They shared a bottle of wine and talked until 11:30 p.m., when Doe's friend went home. Doe — still "angry and depressed" and anticipating a difficult day at work the following day — finished the bottle of wine and listened to music. She turned off the lights and went to bed between 12:30 and 1:30 a.m. on April 29, 2010. Doe slept in the gray turtleneck and bra she had worn to work.

Around 3:00 a.m. on April 29, 2010, Doe woke to a man — later identified as appellant — "spooning [her] . . . trying to cuddle with [her]." Doe did not feel the effects of the alcohol she had consumed the night before, but she was "in shock" to find a stranger in her bed. "[D]umbfounded," Doe asked appellant who he was. He responded, "how drunk are you? Don't you remember you invited me in?" He told Doe his name was John and that he entered the house through the back door, which Doe did not use and which she assumed was locked. Doe was worried appellant was going to rape her. Doe asked appellant questions because she thought she could "de-escalate the situation" if she engaged appellant in conversation. Appellant did not seem confused or disoriented.

Appellant pulled Doe's bra and turtleneck off and "got on top of [her]." Doe "smacked him across the face." He smacked her back and threatened her, saying several times: "[D]o you want to f . . . ing die? I'll f . . . ing kill you." Doe slapped appellant a

3

second time and he repeated his threats. At one point, appellant put his hands over Doe's mouth and said to her, "you shouldn't be walking around the house like that."

Appellant kissed Doe's mouth, sucked her breasts, and told her she had "nice cakes." Then he rubbed Doe's vaginal area and "partially thrust" his fingers inside her vagina. Appellant spat on Doe's vagina to try to lubricate her. He thrust his penis into her vagina several times, partially penetrating Doe's vagina and hurting her. Then appellant rolled Doe onto her stomach and pulled her into an "all fours position." He commented, "I bet you like it this way" and sodomized her several times. Doe "felt like [she] needed to cooperate because [she] was scared for her life[.]" She did not scream, or try to run away, because she thought appellant would catch her and kill her. She also faked an orgasm because appellant told her he would leave when he was "done" and Doe thought faking an orgasm "would make things quicker."

Next, appellant turned Doe onto her back. He shoved his penis into Doe's mouth and ejaculated as she gagged. Doe spit the ejaculate onto the floor. After he ejaculated, Doe pulled up his orange shorts and walked out the door, saying nothing. Doe said, "goodbye, John" to make him think she was not upset and would not call the police. A minute or two after appellant left, Doe called 911. It was hard for Doe to find her phone or dial 911 because her "hands were shaking so much[.]"[3]

Police officers arrived at Doe's house and saw she was visibly shaken. Law enforcement officers and evidence technicians noticed the back door to Doe's house was closed but unlocked, the bedding was messy, and there was a pool of semen on the floor next to Doe's bed. Crime scene photographs showed a silver pick-up truck parked on the street in front of Doe's house at 8:00 a.m. A nurse conducted a sexual assault response team (SART) examination and observed: (1) Doe had a swollen uvula, red and swollen tonsils, and tiny bruises in her mouth that can be caused by blunt force trauma; (2) Doe's vagina had a bleeding laceration; and (3) Doe's anus had multiple lacerations. The nurse

---

[3]     The prosecution played the 911 call for the jury and the court admitted a transcript of the call.

4

concluded the physical findings were consistent with Doe's description of being sexually assaulted.

A criminalist determined the fluid on Doe's floor was semen and that a swab from Doe's breast contained human saliva. Another criminalist tested the various swabs and fluids for DNA, including a swab from appellant's penis. The criminalist found appellant's and another's DNA on the penile swab. The criminalist testified the chances the foreign DNA belonged to someone other than Doe was 1 in 280,0000 Caucasians. The criminalist found Doe's and another's DNA on a breast swab and testified the chances the foreign DNA belonged to someone other than appellant was 1.2 trillion Caucasians. An expert in wireless technology examined appellant's cell phone and determined he made 15 calls or texts in the area of Doe's residence from 2:00 a.m. to 8:30 p.m. on April 28, 2010 and used his cell phone in the area of Doe's house on the morning of April 29, 2010.

At 8:30 a.m. on April 29, 2010, law enforcement officers stopped appellant driving a silver pick-up truck. Appellant was wearing orange shorts. He was disheveled and had "fresh scratches on his face." Napa Police Officer Joseph McCarthy interviewed appellant at the police station and arrested him.

*Defense Evidence*

A.     Appellant's Testimony

In April 2010, appellant had been having a "hard time" with his then girlfriend, Amanda F. (Amanda), and often slept in his silver truck in Fuller Park. He sometimes made telephone calls from his truck. He was depressed and anxious and had been having difficulty sleeping. A doctor had prescribed Klonopin and Effexor XR for his depression but appellant did not take the medication consistently. Appellant sometimes took Tylenol P.M. to help him sleep, and smoked marijuana to calm down. Appellant claimed a history of sleepwalking. According to appellant, he had sleepwalking episodes in 2005 and was sleepwalking when he went to Raina's house in 2008.

On April 28, 2010, appellant — who worked as a landscaper — spent the day picking roses and "scratching [his] hands up." Around 11:00 p.m., appellant parked a

5

block away from Fuller Park and dozed off in his truck. He had a "vague memory" of being at the park, but he could not remember why he was there. Appellant explained he also had a "dream memory" of sitting on the curb "right across almost from Jane Doe's house" where his old boss lived. He explained, "I was sitting on the curb . . . I have a memory of sitting on the curb just looking at [the boss's] house, that's all I remember." Appellant also had a "very, very brief" memory of "cuddling up with someone in bed and trying to get warm." Then he remembered starting to wake up, "starting to become more conscious [of his] surroundings[.]" Appellant remembered talking to someone and "fooling around . . . some sort of sexual foreplay[.]"

Appellant recalled being orally copulated and being aroused, but he did not know who he was with or where he was. According to appellant, it was "very, very weird. Very, very strange." As appellant explained, "I knew this old familiar feeling, so I didn't freak out or nothing, because I had woke up slowly." Appellant did not remember talking to Doe, but he did remember she mentioned her name, said she had to go to work, and that she asked him to leave. Appellant left Doe's house through the back door. He walked to the river, leaving his truck parked near Doe's house. He tried to remember what happened, but he could not. This "memory lapse" was a "familiar feeling" to appellant.

About 30 minutes later, appellant went back to get his truck and saw law enforcement officers. He was afraid, "kinda [*sic*] freaking out" because he "couldn't remember what happened[.]" He fell asleep in the bushes. When he woke up, the police were gone. He found his truck and drove away. Shortly thereafter, the police stopped appellant and took him to the police station, where Officer McCarthy interviewed him. Appellant was afraid to tell Officer McCarthy he did not remember what happened with Doe, so he made up a story by "fill[ing] in the gaps" in his memory. At first, appellant thought Doe was "trying to set [him] up" because he said something that "hurt her feelings" but — after reading his statements to the police and the police reports — he realized he had been sleepwalking during the incident.

6

On cross-examination, appellant testified he pleaded no contest to a prowling charge in the 2008 incident with Raina. Appellant admitted lying during his police interview; he claimed he was embarrassed he did not know what happened with Doe, so he made up a story.[4] Later, he claimed he was confused and upset during the police interview and was "having anxiety attacks." Appellant also admitted he lied to his mother and his daughter about the incident. He conceded he told his mother he was very enthusiastic about the defense of unconsciousness, which he had discovered while performing legal research in jail. He told his daughter he "need[ed] more of a defense." In addition, appellant told his daughter, his girlfriend, his brother, and his mother to come to court and testify about his sleepwalking episodes.

B.      Dr. Kin Yuen, M.D.'s Testimony

Dr. Yuen testified for the defense as an expert in "medicine and sleep [ ] disorders." After interviewing appellant and conducting a limited physical examination in jail, she determined appellant had a severe obstructive sleep apnea. Dr. Yuen estimated appellant stopped breathing 20-30 times a night. According to Dr. Yuen, sleep apnea can precipitate a sleepwalking episode. Factors precipitating a sleepwalking episode also include use of prescription medications and illegal drugs, and depression. Appellant told Dr. Yuen he smoked marijuana, but did not tell her he had tested positive for methamphetamine on April 29, 2010.

Appellant told Dr. Yuen he had a history of sleepwalking and described the sleepwalking episodes. According to Dr. Yuen, people can engage in atypical sexual behavior while sleepwalking. A person is unconscious of his actions while sleepwalking and, upon awakening, can "feel very disoriented" and "confused because they don't

---

[4]      In an August 2010 letter to a jail inmate, appellant claimed he didn't force anything on "this chick" and stated Doe said he raped her as "[r]evenge" because he had called her various insulting names during the incident. He claimed the criminal charges would "not hold up" because of Doe's "alcohol level" and explained, "I took advantage of a drunk chick. That's all." On cross-examination, appellant testified he did not remember writing the letter, but acknowledged hand-writing a petition for writ of habeas corpus. The prosecutor compared appellant's handwriting in the letter to the writ petition. Appellant admitted he lied in the writ petition.

realize how they got there." This confusion can last for up to 30 minutes. A sleepwalker may try to explain or fill in memory gaps if he fears what he may have done while sleepwalking.

Dr. Yuen testified appellant's account of the incident was consistent with someone who is sleepwalking. She explained, "[a]s a physician generally we give the patient [the] benefit of the doubt, so the question is whether his story is possible, and that's how I render my opinion regarding [ ] whether that was a possibility or not."

C.     Other Testimony

Robert Hansen, a supervisor for the Napa Department of Parks and Recreations Services, testified about a 2004 or 2005 incident when a disheveled appellant appeared at work at 4:40 a.m., several hours before his shift began. Appellant was not wearing work clothing and seemed confused and disoriented; he said he was building a bomb shelter. Hansen did not know if appellant was sleepwalking or under the influence of drugs. Appellant's older brother testified appellant sleepwalked from age one or two until age six or seven. Appellant's brother also testified appellant had "amnesia" — he would not remember sleepwalking the next day.

Appellant's 22-year-old daughter testified that when she lived with appellant in 2007, he had sleeping issues: he had difficulty sleeping, woke up frequently at night, and sometimes woke up, walked out to the living room "and he was kind of like just awake but not awake[.]" Appellant's daughter recalled a 2005 incident when appellant seemed to be under the influence of drugs but could have been sleepwalking. When she visited him in jail, appellant told his daughter he had been sleepwalking when he went to Doe's house. He also told his daughter Doe orally copulated him, that he "stuck [his] fingers in her[,]" and that had methamphetamine in his system the day of the incident.

Appellant's ex-girlfriend, Amanda, testified she lived with appellant for about a year and a half. During that time, appellant had irregular sleep patterns and slept three to four hours a night but Amanda did not recall appellant sleepwalking or experiencing memory lapses. According to Amanda, appellant was "[a]bsolutely not" capable of sexually assaulting Doe. Amanda talked to appellant on the phone on the morning of

8

April 29, 2010 and he cried, mumbled, and told her he missed her and wanted to reconcile. He also told Amanda he had consensual sex with a drunk woman he met downtown. During a conversation with appellant while he was in custody, appellant told Amanda his defense had changed: he now claimed he was sleepwalking during the incident with Doe and did not remember certain things about the incident. Amanda conceded appellant's sleepwalking defense was different than what appellant originally told her about having consensual sex with an intoxicated woman he met downtown.

***Verdict and Sentencing***

The jury convicted appellant of forcible rape (§ 261, subd. (a)(2)); forcible oral copulation (§ 288a); sodomy by use of force (§ 286, subd. (c)(2)(A)); sexual penetration with a foreign object by force and violence (§ 289, subd. (a)); and first degree residential burglary (§ 459) and found various sentencing enhancements true. The court sentenced appellant to 50 years to life in state prison.

DISCUSSION

I.

*The Court Did Not Abuse Its Discretion by Allowing the Prosecution to Introduce Evidence of Appellant's Police Interview on Rebuttal and Any Error Was Harmless*

Appellant contends the court erred by allowing the prosecutor to introduce evidence of his "admissions to the police" during rebuttal rather than during the People's case-in-chief. He claims the error violated "California statutory procedures" and his right to due process of law under the federal and state Constitutions.

A.     The Rebuttal Testimony

During the defense case, the prosecutor told the court she planned to introduce an hour-long videotape of appellant's interview with Officer McCarthy. After the last defense witness testified, defense counsel objected, explaining, "I believe this is something that should have been part of their case in chief. The officer was present. He testified in their case in chief. He was able to testify at that time about the statements that Mr. Boyce gave. [¶] Also, Mr. Boyce testified in this case about his statement. He admitted he lied in his statement. So this isn't a situation where we're bringing in

9

rebuttal evidence to contradict what he said since he's already admitted in our case that he lied. So I don't see [how] the purpose of rebuttal is served by that."

In response, the prosecutor argued the People were "under no obligation to introduce the defendant's statement in our case in chief." The prosecutor explained, "I purposefully designed the case so that I wouldn't be introducing his statements. I wanted there to be a situation that if he was going to assert an affirmative defense that he was going to need to take the stand. I was able to impeach him and now the proper course is to bring in those original statements. . . . [¶] The . . . defendant admits his lies, but also what the jury needs to see, because it was a large part of their own expert's testimony as well as the testimony of their client, was [ ] he glassy eyed, was he confused, was he unable to answer questions, was he able to handle a linear conversation . . . was he . . . quick to answer questions or did he seem confused and unsure about what was going on." The prosecutor claimed the evidence was relevant because it "flies right in the face" of appellant's sleepwalking defense.

The court permitted the prosecution to present the videotape in rebuttal. It concluded: "the demeanor, even though it is approximately four to five hours after the incident, [is] still close enough given what Dr. Yuen had to say about sleep patterns and other factors. I think it has some relevance and I think the People can take their chance on the statements and not have to present it in their case in chief. It was basically something that can be defined as exculpatory and they don't have to find something is basically an exculpatory comment until they realize the defense has actually put consciousness in issue, which as we all know doesn't have to be put in. . . . So I will allow the statement at this time."[5]

During the interview — which occurred at 9:00 a.m. on April 29, 2010 — appellant told Officer McCarthy he went to Safeway on April 28, 2010, where he met

_____

[5] The prosecution played the first portion of the video for the jury. Because of a technical malfunction, the last part of the interview was not captured on videotape. Officer McCarthy testified about the interview and the court admitted a transcript of the interview.

10

Doe for the first time. Doe was drunk. They walked to the park, where Doe "was drinking a bottle of wine." Doe told appellant she "wanted to go home to cry" and started crying on appellant's shoulder "about how her dog died." Doe told appellant she lived near the park and asked him where he was staying. Appellant decided to go with Doe to her house. She went home first to clean up and left the back door open for him. Appellant entered Doe's house through the back door and found her lying in bed, in the dark. They hugged and kissed. They cuddled and were "lovey-dovey" but they did not "do it" because he thought she smelled badly. Doe "got kind of pissed," so appellant had her orally copulate him. Then Doe said, "'Get in here, big boy.'" When appellant declined, Doe "flipped out" and called him names because he would not have sex with her. According to appellant, Doe was "mad" because "I got mine . . . and didn't give her hers." Appellant claimed Doe was "psychotic . . . something's wrong with her" because she was "flirty" and "wanting to get busy" one minute and then talking to herself the next minute. He also said the scratches on his face were from "picking roses."

Officer McCarthy told appellant Doe had described the incident differently. In response, appellant said, "Well, as mad as she was, she probably f . . . ing thinks I raped her. She probably called rape, huh?" Appellant repeatedly denied raping Doe and suggested the police "check her for a psych eval." Appellant claimed he was telling Officer McCarthy "the honest truth." Officer McCarthy lied to appellant to see if he had been at Doe's house "hours before" and whether he had "stalked her prior to going inside." Officer McCarthy told appellant that someone saw him in Doe's house. In response, appellant changed his story. He said he "could" have been looking in the window before he went in the house and admitted the lights were on when he entered.

Officer McCarthy also told appellant the SART examination revealed Doe had injuries to her vagina and anus, even though Officer McCarthy did not have access to the results when he interviewed appellant. In response, appellant told McCarthy he had tried to insert his penis into Doe's anus and that she might have injuries because of the size of his penis. At the end of the interview, Officer McCarthy arrested appellant. Officer McCarthy testified appellant was "very lucid" during the interview. "[H]e was more than

11

willing to provide information, and he was pretty forthright with some of the lies he was telling."

B.     The Admission of Appellant's Police Interview as Rebuttal Evidence Was not Erroneous and Any Error was Harmless

As our high court has explained, "'[i]f evidence is directly probative of the crimes charged and can be introduced at the time of the case in chief, it should be.' [Citation.] '[P]roper rebuttal evidence does not include a material part of the case in the prosecution's possession that tends to establish the defendant's commission of the crime. It is restricted to evidence made necessary by the defendant's case in the sense that he has introduced new evidence or made assertions that were not implicit in his denial of guilt.' [Citation.] [¶] The reasons for the restrictions on rebuttal evidence are 'to (1) ensure the orderly presentation of evidence so that the trier of fact is not confused; (2) to prevent the prosecution from "unduly magnifying certain evidence by dramatically introducing it late in the trial;" and (3) to avoid "unfair surprise" to the defendant from sudden confrontation with an additional piece of crucial evidence.' [Citations.] [¶] 'The decision to admit rebuttal evidence over an objection of untimeliness rests largely within the sound discretion of the trial court and will not be disturbed on appeal in the absence of an abuse of that discretion.' [Citation.]" (*People v. Mayfield* (1997) 14 Cal.4th 668, 761 (*Mayfield*); *People v. Young* (2005) 34 Cal.4th 1149, 1199 (*Young*); see also § 1093, subd. (d) [procedural order for criminal trials].)

Appellant contends his statements during the interview "tended to prove his guilt" and "constituted admissions which properly belonged in the prosecution's case-in-chief." We disagree. Throughout the interview, appellant denied raping Doe. He claimed the encounter was consensual, that it was initiated by Doe, and that she claimed he raped her to retaliate against him. Evidence of the police interview became relevant on rebuttal because appellant testified and asserted an affirmative defense of unconsciousness, which was "'not implicit in his general denial of guilt.'" (*Young, supra,* 34 Cal.4th at p. 1199, quoting *People v. Carter* (1957) 48 Cal.2d 737, 753-754 (*Carter*).) The police interview was relevant for several reasons: (1) to impeach appellant's trial testimony that he was

12

unconscious during the incident; (2) to impeach appellant's testimony that he was confused and upset during the police interview; (3) to impeach defense expert Dr. Yuen's testimony that appellant was prone to sleepwalking; and (4) to demonstrate appellant was a liar. Testimony "that repeats or fortifies a part of the prosecution's case that has been impeached by defense evidence may properly be admitted in rebuttal." (*Young, supra,* 34 Cal.4th at p. 1199.)

Appellant's reliance on a line of cases beginning with *Carter* is misplaced. In *Carter*, the prosecution withheld from the defense the defendant's distinctive red cap, a crucial piece of evidence found at the murder scene. (*Carter*, *supra*, 48 Cal.2d at pp. 743, 752.) Because the defense did not know the cap had been found at the scene, it presented a defense that the defendant was not in the vicinity at the time of the murder. The prosecution then sprung the cap on the defense as a surprise in rebuttal. The California Supreme Court "disapproved of the prosecutorial tactic of intentionally withholding crucial evidence properly belonging in the case-in-chief to take unfair advantage of the defendant." (*People v. Friend* (2009) 47 Cal.4th 1, 44.) *Carter* does not assist appellant because, as our high court has explained, that case applies "only to '"crucial"' or '"material"' evidence that properly belonged only in the case-in-chief." (*Ibid.*, quoting *People v. Bunyard* (1988) 45 Cal.3d 1189, 1212.) Here, the police interview "was not evidence that by itself established guilt or was directly probative of the crimes charged. [Citation.] Rather it was collateral evidence bearing on [appellant's] credibility." (*Ibid.*)

We conclude the court did not err by admitting evidence of appellant's police interview on rebuttal. (See *People v. Hart* (1999) 20 Cal.4th 546, 653 [court's discretion to admit rebuttal evidence will not be disturbed absent "'palpable abuse'"]; *Mayfield, supra,* 14 Cal.4th at p. 762 [no abuse of discretion where court allowed prosecution to use the defendant's "statement in rebuttal, even though it was known to the prosecution before trial and could have been used during the prosecution's case-in-chief"].) In any event, any error was undoubtedly harmless under either the federal or state standard. (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*); *People v. Watson* (1956) 46 Cal.2d 818, 836.) Evidence of appellant's guilt was overwhelming: appellant had two

13

prior stalking incidents and had pleaded no contest to prowling on a woman's property. At trial, Doe testified appellant forcibly raped, sodomized, and digitally penetrated her, and that he forced her to orally copulate him. The physical evidence — including the SART examination results and the DNA evidence — corroborated Doe's testimony. Moreover, and as appellant concedes, the jury heard the bulk of his statements during the interview on cross-examination. Finally, the evidence supports a jury conclusion that appellant's sleepwalking defense was completely contrived and not credible. Any error in permitting the prosecution to introduce the police interview on rebuttal was harmless under any standard.

## II.

### *Any Instructional Error Was Harmless Beyond a Reasonable Doubt*

Next, appellant claims the jury instructions on the sex offenses — forcible rape, forcible oral copulation, sodomy, and sexual penetration — "were constitutionally infirm" because they permitted conviction on alternate theories but omitted "an essential element for one of those theories."

All four of the charged sex crimes required the prosecution to prove: (1) the act (oral copulation, sexual intercourse, sodomy, and sexual penetration with a foreign object); (2) lack of consent by Doe; and (3) appellant accomplished the act under one of various alternate theories (force or fear, future threats of bodily harm, etc.) (See §§ 261, 286, 286, 289; CALCRIM Nos. 1000 [Rape or Spousal Rape by Force, Fear or Threats], 1015 [Oral Copulation by Force, Fear, or Threats], 1030 [Sodomy by Force, Fear, or Threats], 1045 [Sexual Penetration by Force, Fear, or Threats].)

According to appellant, the jury instructions "allowed the jury to convict [him] of the four charged sex crimes on the basis that the acts were accomplished by threatening to retaliate, a threat of future harm, without requiring the jury to find a necessary element for conviction under that theory — a reasonable possibility that appellant would execute the threat." Appellant claims the jury instructions "provided that a defendant is guilty if he 'accomplished the act by force, violence, duress, menace, or fear of immediate and unlawful bodily injury' and then defined 'duress' as a 'direct or implied threat of force,

14

violence, danger, hardship, or retribution that causes a reasonable person to do something that he or she would not otherwise do' and 'retribution' as 'a form of payback or revenge.' They . . . omitted, however, an essential element required for conviction under the second theory — that the jurors must find there was a reasonable possibility that the threat of future harm would be carried out."[6]

Assuming the instructions at issue were erroneous, we conclude any error was harmless beyond a reasonable doubt. (*Chapman, supra,* 386 U.S. at p. 24.) The evidence overwhelmingly established appellant used direct force and violence and threats of immediate harm to accomplish the sex acts. Appellant slapped Doe; as he did so, he said, "[D]o you want to f . . . g die? I'll f . . . ing kill you." There was no possibility the jury would have interpreted appellant's threat to kill Doe as a threat of *future* — rather than immediate — harm, particularly where appellant concedes he "slapped and threatened [ ] Doe at the same time[.]" Appellant's threat contained no suggestion that it would be carried out at some future time. Rather, the threat to kill Doe, coupled with the slaps to her face, were an explicit demonstration of appellant's immediate readiness to use force and violence to overcome Doe's resistance and accomplish the sex acts. Even assuming appellant's threats could be viewed as threats of *future* harm, Doe testified appellant threatened to kill her and that she did not try to run away because she thought appellant would catch her and kill her, demonstrating "a reasonable possibility that the defendant would carry out the threat." (CALCRIM No. 1000.)

The evidence is not — as appellant contends — "'open to the interpretation'" that he is not guilty. The record simply does not support a finding that appellant did not accomplish the sex offenses by force or fear and it is not likely a juror would have

---

[6]  We reject the People's argument that appellant forfeited his complaints by failing to object to the jury instructions in the trial court. "[I]t is well settled that no objection is required to preserve a claim for appellate review that the jury instructions omitted an essential element of the charge." (*People v. Mil* (2012) 53 Cal.4th 400, 409.) Addressing the issue on the merits, we reject it.

predicated his guilt under the theory of future retaliation. The omission of the definition of future threat from the jury instructions was not prejudicial.

III.

*Appellant's Prosecutorial Misconduct Claim Fails*

Appellant's final contention is the prosecutor committed misconduct during her rebuttal argument by defining "abiding conviction as nothing more than a gut feeling[.]" To forestall a habeas claim of ineffective assistance of counsel, we address this claim despite his trial counsel's failure to request a jury admonition. (*People v. Panah* (2005) 35 Cal.4th 395, 462.)

A.      Closing Arguments

During defense closing argument, counsel defined reasonable doubt as the "highest standard" in the criminal justice system. Counsel explained, "there are several different standards that we have in the criminal justice system, reasonable doubt being the highest." He reiterated, "[r]easonable doubt is the highest standard. It's the highest. It's not well, maybe. It['s] not well, it could have happened this way. It's a situation where I believe that five years, ten years from now when you think back on this trial, you say I did the right thing, there was no doubt in my mind, there's no reasonable doubt. That's the best example that I can give you. But if you have some doubt . . . in this case, and there's a tremendous amount of doubt, you must find Brad Boyce not guilty."

In her rebuttal argument, the prosecutor argued:

"Defense counsel during his closing . . . said that the law is that if you have some doubt, you must find the defendant not guilty. But that is a misstatement of the law. The law is provided to you by jury instruction No. 220.[7] Reasonable doubt leaves you with an

---

[7]      The trial court provided the jury with the standard reasonable doubt instruction in CALCRIM No. 220, which provides in part: "A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt. [¶] Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence

16

abiding conviction that the charge is true.  That's the language of the jury instruction.  It's not that if you have some doubt you must find him not guilty.  The jury instruction goes on to say, the evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt."

The prosecutor continued, "What we're looking for is reasonable doubt.  So the defendant would like you to believe that it's reasonable that he entered that home and was unconscious.  It was reasonable that he made his way in through that gate.  It was reasonable that he sleepwalked into her bedroom and vaginally, anally raped her.  That he threatened her life, that he changed his identity, that he gave her a false name, that he was slapped in the face twice, that he threatened her life, that he forced her to orally copulate him and that he forced his fingers into her vagina, yet he was sleepwalking.  See, he'd like you to think that that is a reasonable recitation of facts, a reasonable story.  And that is for you to decide. [¶] I say that that's nonsense, and I want to be very clear about what the standard is.  See, defense attorneys very much like to put reasonable doubt on a scale and sometimes they'll have a picture or a graph and they put reasonable doubt at the very highest, this almost insurmountable possibility that I couldn't possibly reach.  What is it?  It's an abiding conviction of the truth of the charge.

"When I was in law school I didn't like it.  I asked my professor what that meant.  Did it mean that I was 90 percent sure or 99 percent sure?  I like having numbers associated with my standards of proof, and the law professor told me it's when you know in your gut that it's true.  That's what it means.  It's an abiding conviction that the charge is true.  It's an abiding conviction that you know that Dallas Boyce forcibly raped Jane Doe, that he knew what he was doing, and that he entered the house with that intent."

### B.     The Prosecutor Did Not Commit Misconduct

As noted above, appellant claims the prosecutor committed "serious misconduct in equating abiding conviction with a gut feeling[.]"  According to appellant, by "telling the jury to apply a completely subjective and improper definition of reasonable doubt . . .

---

need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt."

17

diminished the presumption of innocence and reduced the State's burden of proof in violation of due process and the Sixth Amendment[.]" Our high court has held "'[i]t is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements. [Citation.]' [Citation.]" (*People v. Hill* (1998) 17 Cal.4th 800, 829-830, overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13; see also *People v. Mendoza* (2007) 42 Cal.4th 686, 702.) If an allegation of prosecutorial misconduct "'"focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." [Citation.]'" (*People v. Carter* (2005) 36 Cal.4th 1215, 1263.)

Appellant relies on three cases: *People v. Nguyen* (1995) 40 Cal.App.4th 28 (*Nguyen*), *People v. Johnson* (2004) 115 Cal.App.4th 1169 (*Johnson I*), and *People v. Johnson* (2004) 119 Cal.App.4th 976 (*Johnson II*) to demonstrate prosecutorial misconduct, but these cases do not assist him.[8] In *Nguyen*, the prosecutor trivialized the standard of proof by equating it with other life decisions or judgments, some of which were as reflexive and mundane as changing lanes while driving. (*Nguyen, supra,* 40 Cal.App.4th at p. 35.) The *Nguyen* court concluded the error was harmless because the prosecutor also referred the jury to the reasonable doubt instruction. In *Johnson I* and *Johnson II,* the trial court — not the prosecutor — equated the reasonable doubt instruction with making decisions about vacations and getting out of bed. (*Johnson I*, *supra*, 115 Cal.App.4th at pp.1171-1172; *Johnson II*, *supra*, 119 Cal.App.4th at pp. 978-986.)

Here, and in contrast to the cases discussed above, the prosecutor did not equate reasonable doubt to mundane decision-making. Rather, she read CALCRIM No. 220, the jury instruction on reasonable doubt, and explained and repeated that reasonable doubt was "an abiding conviction that the charge is true . . . when you know in your gut that it's

---

[8]     Appellant also relies on several cases from other jurisdictions. These cases are distinguishable and out-of-state authority is not binding on this court.

18

true. . . . It's an abiding conviction that you know that Dallas Boyce forcibly raped Jane Doe, that he knew what he was doing, and that he entered the house with that intent." There was no prosecutorial misconduct. The prosecutor expressly directed the jury to follow the trial court's instructions as to those facts on which the prosecution was required to prove beyond a reasonable doubt. The prosecutor was not — as appellant contends — diluting the People's burden of proof; she was asking the jurors to trust their gut feelings about the evidence.

*People v. Barnett* (1998) 17 Cal.4th 1044, 1156, is instructive. There, the prosecutor commented during closing argument: "'If you have that feeling, that conviction, that gut feeling that says yes, this man is guilty, he's guilty of these crimes . . . that's beyond a reasonable doubt.'" (*Id.* at p. 1156.) Relying on former CALJIC No. 2.90, which contained references to the terms "'moral evidence'" and "'moral certainty,'" the defendant claimed the prosecutor's comments made it reasonably likely the jury would have misunderstood the instruction as allowing for a finding of guilt on a standard lower than proof beyond a reasonable doubt. (*Barnett, supra,* at p. 1156.)

Our high court rejected this argument and explained, "When considered as a whole, the prosecutor's argument could not have misled the jury regarding the appropriate standard of proof. The prosecutor was not purporting to define 'moral certainty' as having a 'gut feeling'; rather, he was directing the jurors to trust their gut feelings in assessing the credibility of witnesses and resolving the conflicts in the testimony. Shortly after making the 'gut feeling' reference, the prosecutor clarified that jurors should 'look beyond the mere words that have been testified to,' 'examine closely the various witnesses, their demeanor, their attitude,' and 'apply sometimes a certain intuitive reasoning to who has reasons to lie, who has not. And who to believe.'" (*Barnett, supra,* 17 Cal.4th at p. 1157.) Here, as in *Barnett*, the prosecutor was not purporting to equate reasonable doubt as a gut feeling. We note the context in which the prosecutor directed the jurors to trust their gut feelings in reviewing the evidence and assessing credibility. After making the "you know in your gut that it's true" reference, the prosecutor repeated the language of the jury instruction on reasonable doubt.

Our conclusion that the prosecutor's comments did not denigrate the reasonable doubt standard "is reinforced by the fact that the trial court had repeatedly admonished the jurors, both at the outset of trial and after closing arguments, that they were required to follow the law and base their decision solely on the law and instructions" as given to them by the court. (*Barnett*, *supra*, 17 Cal.4th at p. 1159.) "Those admonishments were sufficient to dispel any potential confusion raised by the prosecutor's argument. No basis for reversal appears." (*Ibid*.) "Jurors are presumed to understand and follow the court's instructions." (*People v. Holt* (1997) 15 Cal.4th 619, 662.)

DISPOSITION

The judgment is affirmed.

_____

Jones, P.J.

We concur:

_____

Simons, J.

_____

Needham, J.

20